**In re William Everette HUNT, Debtor.**

**HEINOLD COMMODITIES & SECURITIES, INC. and E.F. Hutton & Company, Inc., Plaintiffs,**

v.

**William Everette HUNT, Defendant.**

**Bankruptcy No. 381–04076.**
**Adv. Nos. 382–0133, 382–0134.**

United States District Court, M.D. Tennessee.

April 15, 1983.

Order May 9, 1983.

William R. O'Bryan, Jr., Trabue, Sturdivant & DeWitt, Nashville, Tenn., for William Everette Hunt.

Robert J. Warner, Dearborn & Ewing, Nashville, Tenn., for plaintiffs.

## REPORT OF STANDING MASTER [1]

KEITH M. LUNDIN, Bankruptcy Judge, Standing Master.

At issue in this case is the dischargeability of losses incurred by the debtor through trading commodity futures in United States Treasury Bonds. The plaintiffs assert that the debtor's losses are nondischargeable because fraudulently procured by the issuing of bad checks and the making of a false financial statement. For the reasons discussed below, the standing master concludes that the debts to plaintiffs are dischargeable.

## I. FACTS

The plaintiffs, E.F. Hutton & Company, Inc. ("Hutton") and Heinold Commodities & Securities, Inc. ("Heinold") are brokerage firms which provide facilities for the trading of securities, including transactions in the futures markets for commodities.

The debtor, William Everette Hunt ("Hunt"), is 47-years old and has been a college physics instructor for approximately half of the 20 years since receiving his Ph.D. When not teaching, Hunt owned and operated a distributing company and traded in the stock market.

## A. HEINOLD TRANSACTIONS

In 1979, Hunt went to work for Clayton Brokerage Company ("Clayton"), a St. Louis brokerage firm which briefly opened an office in Nashville. After a one-week course, Hunt took an examination and became a licensed stock broker. Prior to his employment with Clayton, Hunt had traded stocks and options for his personal account, but had never traded in the bond futures market. At Clayton, Hunt began trading in futures contracts for United States Treasury Bonds.[2] Hunt was assisted by Mr. Bill Bowen ("Bowen"), a licensed commodities broker. Bowen met Hunt several years earlier when Hunt was teaching. At Clayton, Hunt never took delivery of the bonds for which he contracted. Rather, he bought and sold contracts mostly in day trades and made money or lost money on the swings of the market. Bowen was aware that Hunt maintained the role of speculator, not long term investor. At Clayton (and later at Heinold) Hunt's trades in bond futures were carried out through Bowen because Hunt was not a licensed commodities broker. In April of 1980, Clayton closed its Nashville office. Clayton was succeeded in its Nashville operations by the plaintiff, Heinold and Bowen became the manager of the Nashville Heinold office.

Hunt formally opened a bond trading account with Heinold in May of 1980. The account was opened through Bowen and designated as a "speculation account."

---

1. This report is submitted to the United States District Court for the Middle District of Tennessee pursuant to Administrative Order No. 28 and Rule 53, Federal Rules of Civil Procedure.

2. The essence of the commodity futures market for treasury bonds is that the trader enters into a contract to buy or sell bonds at some future time. One "contract" in the United States Treasury Bond futures market is an agreement to purchase or sell a bond with a face value of $100,000. The bonds are generally of 20-year maturities. A trader may either "day trade" or "position trade." A day trade is when a trader buys and sells a contract (or contracts to sell and then buys to cover) on the same trading day. If the value of the bond goes up during the day, the trader makes money or loses money depending on his position as a buyer or seller. The trader, however, never actually takes delivery of the bonds. The entire transaction is merely a chain of paper promises carried out through the market facilities of the Chicago Board of Trade. In contrast to a day trade, the trader may also make a position trade whereby bond contracts are carried overnight or for longer periods.

Heinold never required or received a financial statement from Hunt. However, Bowen testified that he personally investigated Hunt's financial condition. Bowen determined that Hunt owned land, farms, several buildings and had access to large sums of cash. Bowen ascertained that Hunt had family wealth in the Trenton, Tennessee area. Heinold established no particular credit limit for Hunt. Instead, Heinold employed a concept of "risk capital" which, as Bowen explained, is the money Heinold determined a client could afford to lose. Bowen claimed, however, that Heinold never required its brokers to limit customers to "risk capital." Hunt specified "$50,000" as his risk capital on his account application at Heinold.

Bowen explained that Heinold and other commodity brokers impose margin requirements on their bond trading customers which are usually paid in advance of trading. The margin procedures are codified in the Rules and Regulations of the Board of Trade for the City of Chicago.[3] Regulation 431.01(12) provides as follows:

Members shall not accept orders for new trades from a customer, unless the minimum initial margin on the new trades is deposited and unless the margin on old commitments in the account equals or exceeds the initial requirements on hedging and spreading trades and/or the maintenance requirements specified in Regulation 431.03 on all other trades. If the customer has a credit in excess of the initial margin requirements on all old commitments in his account, this may be used as part or all of the initial margins required on new commitments. However, credits in excess of maintenance margins and less than initial margin requirements may not be used. When a customer states that funds required to fully margin his account are being transmitted at once, the member may consider this assurance in lieu of cash for a reasonable period. Members are required to keep written records of all margin calls, whether made in writing or by telephone.

The rules further provide at 431.02(15) that:

A member may use his discretion in permitting a customer having an established account to trade during any day without margining each transaction, provided the net position resulting from the day's trading is margined as required by Rule 286.-00, 431.00 and Regulation 431.02 and 431.-03.

On a one contract U.S. Treasury Bond future purchase (face value $100,000), Heinold required a margin of $2,000. By requiring a customer to post the $2,000 per bond margin, the brokerage house protects itself from liability for losses incurred by the customer. Regulations prohibit the market for Treasury Bond futures contracts from shifting more than two points up or down on any one day of trading. A two point maximum shift computes to approximately $2,000 per contract. Thus, the standard margin requirement for bond futures trading is a single day's maximum swing—$2,000 per bond contract.

Bowen disclosed it was common for Heinold to ignore the Board of Trade Regulation regarding margins in advance of bond trading. A bond trader who is an established customer in the Heinold office may day trade by merely covering account deficits at the close of the day. An established customer who tenders a check to cover the deficit in his trading account is permitted to immediately trade again without posting a margin against the possibility of future losses. Bowen testified that Heinold had a rule that a customer would not be allowed to trade if the customer's account was in an uncovered deficit position. The proof at trial, however, demonstrated that on numerous occasions Bowen permitted Hunt to buy and sell bond futures contracts without first covering the deficit in his trading account.

Hunt advanced a "very sufficient" amount of money when he opened his bond trading account with Bowen. Bowen testi-

---

**3.** The Rules and Regulations of the Board of Trade for the City of Chicago are applicable to the trades in bond futures carried out by Hunt through both Heinold and Hutton.

fied that Hunt would trade as many as 50 bond contracts on day trades and 50 more on position trades three or four times a week. The same procedure was employed for all trades: Hunt would give Bowen a check to cover any deficit in his trading account and Bowen would allow Hunt to trade at will in the bond futures market. Bowen testified that Hunt wrote checks for $40,000, $66,000, and $90,000 to meet margin requirements or as payments of deficits. At one point, Hunt's trading account reflected a surplus of $120,000. Hunt became Bowen's largest bond trader and as manager of the Heinold office, Bowen received a percentage of the commissions earned on Hunt's transactions.

In June or July of 1981, one of Hunt's checks given to Bowen failed to clear Hunt's account. Hunt covered that check with a cashier's check and for some time Hunt was required to meet his margin calls and cover his account deficits with cashier's checks. Thereafter, the practice of using cashier's checks was discontinued and payments were again accepted by personal check. Bowen acknowledged that Heinold could verify a personal check given by a customer before accepting the check and allowing the customer to trade further. In fact, Bowen called Hunt's bankers in Trenton and in Nashville, Tennessee to verify Hunt's checks during the early days of Hunt's bond trading.

The series of Heinold trades at issue in this case began on December 2, 1981. Hunt's trading account at Heinold was apparently in a deficit position on December 2. Nonetheless, Bowen permitted Hunt to day trade 40 bond contracts without requiring him to pay the deficit. The market moved in Hunt's favor and his gain on the trade was $32,812.50. The fees and commissions generated for Heinold were $1,980. After payment of the beginning deficit, Hunt's trading account at Heinold showed a net credit in the amount of $28,010.48 at the close of trading on December 2. By check dated December 7, 1981, Heinold remitted to Hunt the sum of $26,000, leaving a credit balance of approximately $2,000.

Bowen testified that Hunt did not trade at Heinold again until December 9, 1981. The exhibits submitted by Heinold indicate that Hunt's account stood in a deficit position in the amount of $2,817.77 at the opening of trading on December 9, 1981. There is no explanation of what caused the $2,000 credit in Hunt's account to disappear between December 7 and December 9. Nevertheless, with Hunt's account again in a deficit position, and without requiring him to cover the deficit, Bowen permitted Hunt to trade. Bowen testified that Hunt traded 80 bond contracts on December 9. One exhibit submitted by Heinold indicates that in fact Hunt traded only 40 bond contracts on December 9. Notwithstanding this discrepancy, the market did not favor Hunt and he closed the day with a net loss of $10,730, including commissions of $1,980. Combined with the beginning (unexplained) deficit, Hunt's account reflected a deficit of $13,547.77 at the close of business on December 9.

On December 10, Hunt came into the Heinold office "very enthusiastic" and ready to trade again. This time, Bowen required Hunt to cover the deficit in his account before allowing him to trade. Hunt tendered Bowen a personal check in the amount of $15,000. Because checks delivered to Heinold in Nashville were mailed to the Heinold office in Chicago before being posted to customers' accounts, Bowen knew that a check tendered in Nashville would require several days to be posted to the customer's account in Chicago and then several more days to be routed back to the customer's bank. Bowen did not verify the December 10 check with Hunt's bankers. Hunt was allowed to buy and sell 80 bond contracts on December 10. The market moved against Hunt and after deduction of $3,950 in commissions, Hunt suffered a loss of $42,710. Hunt tendered a $45,000 check dated December 11, 1981 to cover this deficit. Hunt did not trade with Heinold after December 10, 1981.

The $15,000 check delivered on December 10 was credited to Hunt's account by Heinold in Chicago on December 15 and wan-

dered through banking channels until December 21 when it was dishonored by Hunt's bank. The $45,000 check was also returned for insufficient funds.[4]

## B. HUTTON TRANSACTIONS

Hunt's relationship with Hutton began formally with the opening of an account on September 29, 1981. To open his account, Hunt completed a financial information form furnished by Hutton. This one-half page statement signed by Hunt on September 29, 1981 reflected an annual salary of $50,000 and income from interest, dividends and other sources of approximately $100,-000. Hunt scheduled total assets of $825,-000 including real estate worth $500,000 and a home with an estimated market value of $135,000. Other assets, including securities, made up the balance. The liability side of the information form indicated a $25,000 mortgage on Hunt's home. Hunt represented net worth of $800,000. In a line reading "risk capital available for commodity trading" Hunt wrote "approximately $100,000."

Frederick Steven Stanley ("Stanley"), a Hutton commodity broker who testified at trial, admits discussing the financial information form with Hunt. Stanley acknowledges that he was aware that the statement was an incomplete description of Hunt's finances. In particular, Stanley remembers commenting to Hunt that it must be nice to have so little debt. Hunt responded that he had not revealed everything on the form, but that he was merely putting down enough to satisfy Hutton. Hunt admitted at trial that the financial statement was not complete. Instead of listing all his assets and liabilities separately in the small spaces provided, Hunt netted what he considered to be his major assets against what he considered to be his liabilities in arriving at the gross figures indicated on the statement. Hunt included certain assets owned jointly with his wife or owned by his mother. Based on his investigation of land values Hunt estimated the value of farm property owned by him individually and owned by his mother to be worth approximately $1.3 million if marketed as a package. Hunt, an only child, assumed that he would have control over these assets or that he would inherit them outright.

Stanley and Stanley's boss, Mr. John Steele ("Steele"), the manager of the Nashville Hutton office, both testified concerning Hutton's procedure for processing Hunt's financial information form. The form was forwarded for approval to the Commodity Credit Division of Hutton in New York. The commodity credit personnel conduct a thorough investigation of each applicant prior to approving a commodity trading account. Three or four weeks after forwarding Hunt's financial information form to New York, Commodity Credit informed Steele that Hunt had not revealed all of his debts, but that he and his family had a net worth in excess of the $800,000 shown on the financial statement.[5] Steele relied on this information in his dealings with Hunt. Steele testified that part of the information he and Commodity Credit collected regarding Hunt came from a Mr. Patterson at the Bank of Trenton in Trenton, Tennessee. Stanley, Steele, and Commodity Credit were all aware that the statement given by Hunt was not accurate or complete. Steele demurred that he was not concerned that Hunt had not revealed all of his debts. He explained that many of his clients do not care to reveal their financial affairs to Hutton.

The testimony and exhibits create some confusion concerning Hutton's policy for

---

**4.** Bowen testified that his relationship with Heinold renders him personally responsible for the full amount of Hunt's loss. Bowen is repaying Hunt's losses to Heinold.

**5.** Stanley consistently testified that Hutton in New York had determined that Hunt was worth approximately $650,000. Steele testified that Commodity Credit at Hutton in New York had determined that Hunt and his family had a net worth in excess of $800,000. No explanation was offered for the difference in the understanding of Hunt's net worth given by Stanley and the explanation given by Steele. Neither confronted Hunt with the known errors, inconsistencies or incompleteness in the financial statement.

margin calls and credit limits. At one point Stanley testified that Hutton required a $2,000 per bond margin—the same margin required by Heinold. Stanley then explained that for day trading the margin requirement was only $1,000 per bond contract. If the customer was a "good customer" or had an "established account," Hutton did not even require the $1,000 per bond margin for day trading. No customer was allowed to continue trading with his account in a deficit position. However, this too was subject to exception at Hutton. Hutton would allow a customer three or four days from the creation of the account deficit or margin call to meet the margin or cover the deficit. Stanley testified that as long as a customer is within the credit limits established by Hutton in New York at the end of the day's trading, the customer is permitted to trade at will during the course of the day. In a written statement supplied to Hutton and made an exhibit at trial, Stanley summarized the Hutton credit limit policy: "as long as a customer met his margin calls, he could trade whatever he wanted." Stanley further observed that in practice "day trades did not seem to be included under the credit limit, no comment was made when others, or myself, exceeded the credit limit day trading as long as we were within limits at the end of the day." Steele said that the credit limits set by Commodity Credit were merely a "guideline" which could be changed with a phone call to New York. Steele testified that he "would like to see" deficits down to credit limits at the end of that day, but if the customer wants to continue trading, "it depends on the customer."

At Hutton, Hunt's account was handled primarily by Stanley who had known Hunt for approximately 10 years. Stanley knew Hunt when Stanley was employed by Merrill Lynch and Hunt was a customer trading stocks and options. Stanley stated that Hunt "always did very large numbers and was considered a very good customer."

Stanley characterized Hunt as a "big number man" and he knew that Hunt traded with more than one broker. Hunt's "general reputation among brokers in Nashville was that of a person who does nothing but trade the markets, was quite wealthy and a very responsible customer." At some point, Stanley was also employed by Heinold where he observed Hunt's trading habits. Stanley considered Hunt to be an experienced bond trader. Hunt was Stanley's largest bond customer and became Hutton's largest Nashville bond trader. Stanley and Hutton received substantial commissions generated through Hunt's trading.

At trial, Hutton introduced two detailed summaries of Hunt's trading in bond futures. Hunt first traded bond futures at Hutton on September 30, 1981—the day after opening his account and giving the financial statement. On that day, Hunt traded 60 bond contracts. According to Stanley, Hunt was required to meet a $100,000 margin call on his first day of trading.[6] In the following few days, Hunt was called upon to satisfy another call in the amount of $27,000. The records supplied by Hutton and the testimony of Stanley and Steele confirm that Hunt traded bond futures at Hutton three or four times a week between September 30 and early December, 1981. Hunt traded in blocks of five, ten, twenty and sixty bonds, sometimes executing day trades, sometimes maintaining a position overnight. Steele testified that he inquired about Hunt from time-to-time during the Fall of 1981 and was aware of the volume and frequency of Hunt's trading. Stanley testified that Hunt was making money during October and November.

Consistent with his pattern, Hunt bought and sold bond futures contracts at Hutton in various amounts during the first week of December, 1981. During that week, Hunt sustained substantial losses. Hutton permitted Hunt to continue trading throughout the week, notwithstanding the accumu-

---

**6.** It was not altogether clear from the testimony whether this was a $100,000 loss from trading or merely a margin call. Stanley described it as a margin in his direct examination. One exhibit indicates that Hunt's first trade at Hutton was a 60 bond day trade which produced a substantial net profit for Hunt.

lating deficit in his trading account. On December 7, 1981, Hunt delivered personal checks for $20,000 and $7,000 to satisfy account deficits. These checks cleared his bank without incident.

Between December 7 and December 11, Hunt traded regularly at Hutton, including 50 bonds on December 9, several 30 bond trades, and a multitude of 10, 15 and 20 bond trades. Again, Hunt was permitted to continue trading notwithstanding an accumulating deficit in his account. Between December 7 and December 11, Hunt built up a deficit of approximately $77,000. To satisfy the outstanding balance, Hunt tendered a personal check dated December 10, 1981 in the amount of $95,000 which was drawn on the Bank of Trenton, Trenton, Tennessee.[7] Stanley testified that the check was delivered to him on Friday, December 11. Both Stanley and Hunt acknowledged that Hunt requested that Stanley not deposit the check until the following week. Hutton began processing Hunt's check on Monday, December 14, 1981.

After delivering the $95,000 check, Hunt came to the Hutton office during the week of December 14 but did not trade again until Friday, December 18, 1981. On December 18, Hunt executed a series of trades ranging in size from one bond contract to 100 bond contracts. Trades for the day totalled 300 bonds. Hunt day traded 200 contracts and carried a 100 bond position overnight. The 200 bonds day traded produced a loss of $13,787. Hunt's trading account, however, still reflected a credit balance because of the $95,000 check delivered December 11.[8] Stanley expressed no concern when Hunt took the 300 bond position on December 18. He and Hunt consulted about the bond market on that day and Hunt was quite enthusiastic about trading. All of the trades on December 18 were carried out through Stanley. Although Stanley testified at trial that prior to the trades of December 18 he had never known Hunt to trade more than 80 bonds on a single day, in his written statement to Hutton, Stanley admits that while at Heinold, he observed that Hunt "frequently bought and sold 100–200 bond futures. At the end of the day he wrote a check for whatever was needed and there was never a problem."

The 100 bonds carried overnight on the 18th created a margin call.[9] Stanley stated he went to Hunt's home on Saturday, December 19 and requested that Hunt post a margin of $200,000. Hunt testified that Stanley came to his home on Friday evening, the 18th, to get the $200,000 check. Regardless of the date, Hunt gave Stanley a personal check for $200,000 dated December 18, 1981. Stanley and Hunt both testified that there was concern about immediate collection of the check because Hunt expressed the need to make arrangements with his bank. Stanley again complied with Hunt's request that the check not be deposited immediately.

Either at Hunt's home over the weekend or at the Hutton offices before the market reopened, Stanley and Hunt agreed that Hunt would again trade 300 bonds on December 21. Stanley and Hunt discussed the market and concluded that the 300 bond trade would be strictly a day trade. As

---

**7.** Hunt explained that this check was intended to cover his accumulated account deficit and as the margin on "position" trades he had carried overnight. The records supplied by Hutton indicate that Hunt did maintain a 30 bond position between December 9 and December 11.

**8.** This is according to Stanley's testimony at trial. Though Hutton supplied a computer printout of Hunt's December trades and a typewritten summary, the summary and the computer printout cannot be completely reconciled mathematically. Also, there is no indication in Hutton's records of the margin payment Hunt recalls was included in the $95,000 check.

**9.** One exhibit submitted by Hutton indicates that Hunt carried a 100 bond position after the close of trading on December 18 because Hunt was "unable to get out due to phone problems." Hunt testified that he chose to carry 100 bonds from Friday the 18th to Monday the 21st based on the status of the market on Friday afternoon. Hunt's recollection appears correct because the testimony of Hutton's witnesses corroborates a problem with phones on December 21 but not on December 18.

Stanley recalled, "we had a firm understanding to close out that day." On December 21, Hunt executed a combination of trades totalling 300 bonds. Near the close of the trading day, Stanley attempted to sell 275 of the 300 bonds.[10] Because of "phone problems", Stanley was unable to sell the bonds and trading closed for the day with Hunt still holding all 300 bonds.[11]

The bond market closed at 1:30 p.m. C.S.T. on December 21, 1981. According to Stanley, First American Bank in Nashville called Hutton's offices at 2:30 p.m. on December 21 to inform Hutton that Hunt's $95,000 check dated December 10 had failed to clear.[12] Either in the evening of the 21st or on the morning of the 22nd, Stanley asked Hunt for a margin call on the 300 bonds in his account. Hunt gave Stanley a check dated December 21, 1981 in the amount of $300,000 drawn on the Bank of Trenton.[13] Stanley accepted the $300,000 personal check from Hunt after learning that the $95,000 check had failed to clear.

Stanley, after consultation with Steele, elected to liquidate Hunt's trading account at the opening of trading on December 22. After liquidation, Hunt's account produced a loss of $396,587.50.[14] After conversations with both Heinold and Hutton and unsuccessful efforts by Hunt to cover his obligations, Hunt filed a Chapter 7 petition on December 31, 1981.

Following these events, Stanley resigned his position at Hutton. Stanley explained that if he stayed, he would have to indemnify Hutton for Hunt's losses. Hutton investigated Stanley's activities and found Stanley innocent of any wrongdoing in his handling of Hunt's account. Steele opined that Stanley had properly monitored Hunt's trading and that Hunt had "set up" Stanley. Steele described Hunt as a conman.

Hunt emphatically denied that he had at any time intended to defraud Heinold or Hutton. When he gave Heinold the $15,000 check to retire the deficit in his account, Hunt testified that he intended to cover the check with funds he believed were in his trading account at Hutton. Hunt testified that he intended to cover the $95,000 check he gave to Hutton through further trading and through arrangements of his finances at the Bank of Trenton. Specifically, he planned to generate cash from his trading and to secure a loan from the bank. Hunt anticipated that he could trade his account at Hutton into a position to totally or partially collateralize a temporary bank loan. Hunt explained that he had previously tendered checks to Heinold and Hutton knowing that there was no money in his account at the time of delivery. Each time, through a combination of further trades and cooperation from his bankers, Hunt had been able to cover his checks. Hunt believed that he had purchased enough bonds in. the course

**10.** Hutton offered no explanation why Stanley attempted to sell only 275 of the 300 bonds traded by Hunt. Stanley did not reveal what happened to the "firm understanding" to close out all of Hunt's bonds.

**11.** The exhibits submitted by Hutton corroborate the testimony by Hunt and Stanley that Hunt was stuck with his 300 bonds at the close of trading on December 21, 1981 "due to phone problems."

**12.** Like Heinold, Hutton did not directly credit customers' money through its Nashville office. Hunt's $95,000 check dated December 10, 1981 proceeded through Hutton's normal channels and was not returned for insufficient funds until December 21, 1981. Stanley knew that there was a substantial delay before a customer's personal check would actually reach the customer's bank account. Steele acknowledged that on occasions he would check with a

customers bank to verify funds tendered in personal check form, but did not do so with Hunt's check.

**13.** No explanation was offered as to how Stanley calculated the amount of this margin call. At the close of trading on December 21, Hunt remained with a 300 bond position. Stanley required of Hunt a margin call in the amount of $300,000 or $1,000 per bond. On the 18th, when Hunt carried a 100 bond position overnight, Stanley required a margin of $200,000 or $2,000 per bond.

**14.** Hutton contends that it incurred its loss on Hunt's December 21 trades at the close of business on December 21. The 300 bonds were actually liquidated at the opening of the market on the 22nd, apparently at the same price at which the market closed on December 21.

of his December trading at Heinold and Hutton to have a "reasonable probability" of making the financial arrangements necessary to cover his immediate obligations.

On February 26, 1982, plaintiffs filed complaints objecting to the dischargeability of their respective debts. Heinold seeks a judgment of nondischargeability in the amount of $42,710. Hutton asserts a total nondischargeable claim in the amount of $483,457.50. These matters were consolidated on May 7, 1982 and a trial conducted on July 9, 1982 and August 11, 1982. The proceedings were referred to the standing master for proposed findings pursuant to Administrative Order 28–4 issued by the United States District Court for the Middle District of Tennessee on March 9, 1983.

## II. DISCUSSION

The plaintiffs challenge the dischargeability of their claims under 11 U.S.C.A. § 523(a)(2)(A) (West 1979) for false pretenses, false representations or actual fraud. Hutton also seeks a judgment of nondischargeability under 11 U.S.C.A. § 523(a)(2)(B) (West 1979) for the issuance of a materially false financial statement respecting the debtor's financial condition.[15]

Heinold argues that the $15,000 check tendered by Hunt on December 10 was a false pretense or false representation rendering nondischargeable the $42,710 in losses incurred by Hunt on December 10. Hutton asserts that the $95,000 check delivered on December 10 was a false pretense or false representation which precipitated all losses incurred through Hunt's trading between December 10 and December 22. Hutton also claims that the financial statement given by Hunt on September 29, 1981 was materially false and that all losses incurred by Hunt after delivery of the statement are nondischargeable. Hutton asserts a total nondischargeable claim in the amount of $483,457.50.

It is well established that to sustain an objection to the dischargeability of a debt under § 523(a)(2)(A) the objecting party must prove five elements:[16]

1. that the debtor made materially false representations;

2. that the debtor knew the representations were false at the time he made them;

3. that the debtor made the false representations with the intention and purpose of deceiving the creditor;

4. that the creditor reasonably relied upon the debtor's materially false representations; and

5. that the creditor sustained loss and damages as a proximate result of the materially false representations by the debtor.

*Tepsco Tennessee Pipe & Supply Corp. v. Selby,* BK. NO. 78–20066 (Bankr.M.D.Tenn. May 6, 1982). *See also, First National Exchange Bank v. Spangler,* 14 B.R. 598, 600 (Bkrtcy.W.D.Va.1981); *Hot Springs V.A. Federal Credit Union v. Foreman,* 7 B.R.

---

**15.** Section 523 provides in pertinent part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for obtaining money, property, services, or an extension renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money,

property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

**16.** Other courts have restated this five element test as a three element test and have suggested the availability of certain presumptions and inferences. *See, e.g., H.C. Prange Co. v. Schnore,* 13 B.R. 249 (Bkrtcy.W.D.Wis.1981), in which Judge Martin adopted a three element statement of the § 523(a)(2)(A) exception to dischargeability, but noted its functional similarity to the five element test. *See also, Nationwide Financial Corp. v. Smith,* 2 B.R. 276 (Bkrtcy.E.D.Va.1980) in which Judge Bonney developed a four element test.

776, 778 (Bkrtcy.D.S.D.1980). Where a creditor asserts a nondischargeable claim pursuant to § 523(a)(2)(B), the creditor must also prove that the false representations were in a written statement concerning the debtor's financial condition. This test for evaluating the dischargeability of a debt is essentially the same standard applicable under § 17a(2) of the former Bankruptcy Act. The language of § 17a(2) and the language of § 523(a)(2) of the Bankruptcy Reform Act are similar and cases construing the former Act are considered to be important guidelines in cases under § 523(a)(2) of the Code. *See Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

The standards set forth above are to be strictly construed in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). The doctrine of strict construction is intended to fulfill the Congressional objective that debtors have "a new opportunity of life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 114, 27 L.Ed.2d 124 (1970); *See also Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971). The burden of proving each element is upon the plaintiff. *See Tepsco Tennessee Pipe & Supply Corp. v. Selby,* slip op. at 4. *See also, Household Finance Corp. v. Danns,* 558 F.2d 114, 116 (2d Cir.1977); *Public Finance Corp. v. Taylor,* 514 F.2d 1370 (9th Cir. 1975); *Brown v. Buchanan,* 419 F.Supp. 199 (E.D.Va.1975); *Air Traffic Conference v. Paley,* 8 B.R. 466, 468 (Bkrtcy.E.D.N.Y. 1981); *First National Exchange Bank v. Spangler,* 14 B.R. at 600.

The plaintiff in a § 523(a)(2) case must establish actual or positive fraud involving moral turpitude or intentional wrongdoing, and not merely implied fraud, fraud established by a statute or fraud which may exist without imputation of bad faith or immorality. As the Supreme Court stated in *Ames v. Moir,* 138 U.S. 306, 11 S.Ct. 311, 34 L.Ed. 951 (1891):

It is the settled doctrine of this court that "fraud" in the Act of Congress defining the debts from which a bankrupt is not relieved by a discharge in bankruptcy means "positive fraud, or fraud in fact involving moral turpitude or intentional wrong, as does embezzlement, and not implied fraud or fraud in law, which may exist without the imputation of bad faith or immorality."

*Id.* at 311, 11 S.Ct. at 312. *See also, Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1878); *Brown v. Buchanan,* 419 F.Supp. at 201; *Tepsco Tennessee Pipe & Supply Corp. v. Selby,* slip op. at 4; *United American Bank v. Parker,* 5 Bankr.Ct.Dec. (CRR) 1035 (Bankr.E.D.Tenn.1979). Fraud must be affirmatively proven, not presumed. If there is room for an inference of honest intent, the question of fraud must be resolved in favor of the debtor. *See, e.g., Termplan of Missouri, Inc. v. Rauch,* 18 B.R. 97, 99 (Bkrtcy.W.D.Mo.1982). Warranties or representations created by law—for example, warranties contained in the Uniform Commercial Code—do not alone support a finding of actual fraud or intent to defraud for purposes of § 523(a)(2). *Commerce Union Bank v. Yates,* BK. NO. 380–00114, ADV. NO. 380–0202 (Bkrtcy.M.D.Tenn. Nov. 4, 1980).

The objecting creditor also bears the burden of establishing reasonable reliance upon the debtor's false pretenses or misrepresentations. The reasonable reliance element receives particular attention in false financial statement cases. The courts have required that reliance by the creditor be "reasonable" as a reflection of Congressional intent that a full discharge be the rule and exceptions to discharge which impair the debtor's fresh start be strictly construed against the creditor. *See Murfreesboro Production Credit Assoc. v. Harris,* 8 B.R. 88, 92 (Bkrtcy.M.D.Tenn.1980). *See also, Boatmen's North Hills Bank v. Brewood,* 15 B.R. 211, 214 (Bkrtcy.D.Kan.1981).

## A. FALSE PRETENSES OR FALSE REPRESENTATIONS: [17]
### THE CHECKS

The plaintiffs have failed to prove that Hunt committed fraud or made false representations at the time of delivery of the $15,000 and $95,000 checks. The first principle, not clearly addressed by the plaintiffs, is that the issuing of an insufficient funds check is not, by itself, a fraudulent misrepresentation sufficient to give rise to a nondischargeable claim under § 523(a)(2) of the Bankruptcy Code. This is by no means an unprecedented pronouncement of this court. The principle emerged under § 17a(2) of the former Act. *See, e.g., Obrist v. Christensen,* 337 F.2d 220 (9th Cir.1964); *Robinson v. J.R. Williston & Co.,* 266 F. 970 (1st Cir.1920); *Sanitation Recycling, Inc. v. Jay Peak Lodging Assoc.,* 428 F.Supp. 1022 (D.Vt.1977); *Family Fair, Inc. v. Montbleau,* 13 B.R. 47 (Bkrtcy.D.Mass. 1981); *Anson v. Hopkins,* 9 B.R. 741 (Bkrtcy.W.D.Mo.1981); *Hill v. Murray,* 7 B.R. 899 (Bkrtcy.W.D.Mo.1981); *Montgomery Ward & Co. v. Eason,* 1 B.R. 604 (Bkrtcy.E.D.Va.1979). As the court explained in *Hill v. Murray:*

> The mere writing of a check not backed by sufficient funds and the fact that at the time the check uttered ... [the debtor] ... was aware of this fact is not enough to justify a finding of intentional fraud... The law is clear that a check does not constitute a financial statement... And, under the law governing, it is held that the rendering of an insufficient funds check, absent the making of a misrepresentation which gives rise to a liability which is nondischargeable under the provisions of § 17a(2) ... [does not] give rise to a liability which is nondischargeable.... [I]f it were otherwise, a creditor could easily render his claim immune from discharge in bankruptcy by the simple expedient of demanding checks from the debtor. (citations omitted).

7 B.R. at 900. A check is endowed with many attributes of a contract, but the mere breach of a contract to pay does not give rise to a nondischargeable claim. *See Cadillac Vending Co. v. Haynes,* 19 B.R. 849 (Bkrtcy.E.D.Mich.1982).

The United States Supreme Court has recently acknowledged that the uttering of insufficient funds checks is an unremarkable feature of everyday commerce and that an NSF check is not a false pretense or misrepresentation. In *Williams v. United States,* —— U.S. ——, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) the Supreme Court overturned a criminal check-kiting conviction and Justice Blackmun made the following observations for the majority:

> history is clear that to the extent that *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) held that any lesser standard could be applied and to the extent that subsequent cases interpreted *Tinker* to apply a "reckless disregard" standard those cases are overruled. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The legislative history of § 523 is silent on the question whether a statement made with "reckless disregard for the truth" would be sufficient to establish the first element of a § 523(a)(2) case. There is danger in such an interpretation that the reckless disregard standard will creep into the analysis of intent for § 523(a)(2) purposes. "Reckless disregard" cannot alone establish intent for § 523(a)(2) purposes. As the court recognized in *C.O.T.C.O. Gasoline, Inc. v. Jenes,* 18 B.R. 405 (Bkrtcy.S.D.Fla.1981): "The action by the debtor must have been intentional, and merely reckless representations are insufficient to bring a debt within this section." *Id.* at 407.

---

**17.** The parties have not argued that there is any distinction between "false pretenses" and "false representations" for purposes of § 523(a)(2) analysis. However, see the interesting analysis in *H.C. Prange Co. v. Schnore,* 13 B.R. at 249. There are cases discussing this first step in the calculus—the false representation, false pretense requirement—as being a representation that is knowingly false or made with such "reckless disregard" for the truth that it rises to the level of culpability required by § 523(a)(2). *See H.C. Prange Co. v. Schnore,* 13 B.R. at 249. The courts had held that plaintiffs could prove a willful and malicious conversion of property under § 17a by proving "reckless disregard" for the property rights of others. In the Bankruptcy Reform Act of 1978, Congress rewrote the specific sections at issue in the "reckless disregard" cases. The legislative history to the Bankruptcy Code specifically rejects the "reckless disregard" standard in favor of a more stringent standard of actual intentional conduct. The legislative

Although petitioner deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable upon demand." § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2). The Code also makes clear, however, that "[a] check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument unless he accepts it." § 3–409(1)...

\* \* \* \* \* \*

... [A]s we have noted, a check is literally not a "statement" at all. In any event, whatever the general understanding of a check's function, "false statement" is not a term that, in common usage, is often applied to characterize "bad checks."

*Id.* at —— – ——, 102 S.Ct. at 3092–3093, 73 L.Ed.2d at 773–774.[18] Justice Blackmun continued: "many people understand a check to represent that the drawer will have sufficient funds deposited in his account by the time the check clears, or that the drawer will make good the face value of the draft if it is dishonored by the bank." *Id.* at ——, n. 7, 102 S.Ct. at 3093, n. 7, 73 L.Ed.2d at 774, n. 7.

■ Thus, a creditor cannot rely solely on the existence of an NSF check—there must be some additional proof in connection with the issuance of the check to establish a misrepresentation for § 523(a)(2) purposes. The record herein is devoid of proof that Hunt made any affirmative misrepresentations of fact at the time he delivered the checks. Unlike the debtor in *Anson v. Hopkins,* 9 B.R. 741 who made affirmation representations as to his financial stability, Hunt did not assure either Heinold or Hutton that he would have sufficient funds in his bank account at any particular point in the future.[19] To the contrary, in the Hutton transactions, Hunt requested Stanley to hold both the $95,000 check and the $200,000 check until some additional arrangements could be made. Where a check is delivered with the representation that it is not intended as immediate payment, the creditor must prove some other false pretenses or misrepresentation in connection with the check to demonstrate the first element of its § 523(a)(2) case. The most charitable interpretation of the facts would support only an "implied representation" that Hunt would seek to cover the checks if they were dishonored by his bank.[20] There

18. Tennessee has adopted the Uniform Commercial Code sections cited by the Supreme Court. *See* Tenn.Code Ann. § 47–3–104(2)(b), § 47–3–104(1)(b), § 47–3–413(2) and § 47–3–409(1).

19. It is not clear when the debtor would have to cover the checks written to the plaintiffs. At least one check previously delivered to Heinold had been dishonored by the bank. Nonetheless, Hunt had been permitted to continue trading by subsequently covering the dishonored check with a cashier's check.

20. This implied representation is similar to the "symbolic implied" representation found by

some courts in credit card situations. *See, Nevada National Bank v. Schneider,* 3 Bankr. Ct.Dec. (CRR) 175 (Bkrtcy.D.Nev.1977). Cases in which "symbolic" or implied misrepresentations have been found are generally "shopping spree" cases in which the courts have inferred from the debtor's course of conduct substantial intent on the part of the debtor to defraud the merchants honoring the credit card. *See, e.g., American Express Co. v. Stamps,* Bk. No. 380–03335, Adv. No. 381–0102 (Bkrtcy.M.D.Tenn. Apr. 15, 1982); *First National Bank v. Crosslin,* Bk. No. 379–02056, Adv. No. 380–0020 (Bkrtcy. W.D.Tenn. Nov. 28, 1980). The evidence in this case does not support any such inference.

is nothing in the proof to indicate that this "implied" representation was falsely made by Hunt.

Although not clearly articulated by the plaintiffs, the false pretense or misrepresentation allegedly made by Hunt at the time of delivery of the checks appears to be Hunt's failure to disclose how he intended to cover the checks in the future. Hunt stated at trial that it was his intention to pay the $15,000 check to Heinold with funds he believed were in his Hutton trading account and to cover the $95,000 check to Hutton by a combination of arrangements with his bankers and further bond trades. Under appropriate circumstances, the failure to disclose information may be characterized as a misrepresentation. *See Commerce Union Bank v. Champion*, BK. NO. 381–01076, ADV. NO. 381–0282 (Bkrtcy.M. D.Tenn. Sept. 8, 1981). This "failure to disclose" theory has received substantial attention in the Fifth Circuit. Beginning with the decision in *Davison-Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), it became the rule in the Fifth Circuit that a debt would be discharged where the debtor made no affirmative false representations, but had failed to disclose a disinclination or inability to repay when the debt was incurred. *See H.C. Prange Co. v. Schnore*, 13 B.R. 249, 252 (Bkrtcy.W.D.Wis.1981). Substantial controversy followed within the Fifth Circuit and among commentators regarding the validity of the *Davison-Paxon* holding. Particularly in credit card cases the courts have allowed judgments of non-dischargeability under § 523(a)(2)(A) in the absence of an overt misrepresentation. Several recent decisions suggest that *Davison-Paxon* is no longer good law even in the Fifth Circuit. *See, e.g., Sears, Roebuck & Co. v. Boydston*, 520 F.2d 1098, 1101 (5th Cir.1975); *Bank of Miami v. Quintana*, 4 B.R. 508 (Bkrtcy.S.D.Fla.1980).

█ Even if the "failure to disclose" theory were embraced in this district, the plaintiffs have failed to demonstrate that obligatory information was not disclosed. Hunt was under no obligation to reveal to either Hutton or Heinold the techniques he entertained for covering his checks. No one at Heinold or Hutton questioned Hunt's ability to make financial arrangements to cover the checks. No one indicated that further trading would have been forbidden had Hunt revealed his intended methods for covering the checks. The "failure to disclose" approach to proof of a false pretense or misrepresentation has not been established by plaintiffs.

## B. MATERIALLY FALSE STATEMENT IN WRITING RESPECTING THE DEBTOR'S FINANCIAL CONDITION: THE HUTTON FINANCIAL STATEMENT

The financial statement signed by Hunt on September 29, 1981 was a statement in writing respecting Hunt's financial condition within the meaning of § 523(a)(2)(B).

█ Contrary to plaintiffs' assertions, Hunt's financial statement is not "materially false" because Hunt provided only an incomplete summary of his financial condition. Hunt's decision to summarize his assets and liabilities is consistent with the form supplied by Hutton and the actions of Hutton's employees and does not constitute the statement as false. On its face, the Hutton form does not require the customer to list individually items of assets and specific liabilities. The financial information form supplied by Hutton is not a detailed financial statement of the kind this court is accustomed to seeing in cases involving banks and loan institutions. Rather, in the most general terms, on less than one-half of a standard eleven inch piece of paper, the Hutton form asks the potential customer to do just what Hunt did—summarize assets and liabilities in three or four broad categories.

Arguably, Hunt's statement is false in the sense that the form requests "personal" financial information of the applicant and Hunt included in his netting process assets which would come to Hunt by inheritance or were owned jointly with his wife. Family and spousal assets were not separately identified. Hunt introduced no evidence at

trial from which his legal entitlement to the assets he included in the netting process could be ascertained. Though Hunt was not alone in his belief that his family assets were properly included in an evaluation of his personal wealth,[21] the inclusion of family assets—particularly those that would come to Hunt only through inheritance or gift—painted an inaccurate picture of Hunt's personal financial condition.

"Materiality," however, for purposes of § 523(a)(2)(B) requires more than merely examining the truth of the information provided. A second step is required. The information must not only be substantially inaccurate, but also must be information which affected the creditor's decisionmaking process. For example, the listing of a false phone number in a financial statement would not ordinarily be "materially" false information constituting grounds for nondischargeability. The information must have actual usefulness to the creditor and must have been an influence on the extension of credit. Although there is substantial similarity between such analysis of "materially" and the element of "reasonable reliance" discussed *infra,* analysis of the creditor's use of the requested information is appropriate in both contexts. *See Waterbury Community Federal Credit Union v. Magnusson,* 14 B.R. 662 (Bkrtcy.N.D.N.Y. 1981); *H.C.C. Consumer Discount Co. v. Tomeo,* 1 B.R. 673 (Bkrtcy.E.D.Pa.1979). In this case, when the financial statement was delivered, Stanley and Hunt had a conversation in which it was admitted that the financial statement was incomplete. The Commodity Credit investigators at Hutton did an independent investigation and informed Hutton's Nashville office that the financial statement was incomplete and that there were liabilities not indicated on the form. Hutton was still satisfied with Hunt's financial ability and extended him substantial credit and trading privileges. Where a potential creditor knows that the financial statement it has received is sub-stantially inaccurate, that lender bears a great burden to prove that the false information in that financial statement was nonetheless material, useful, necessary or important in its decision to extend credit to the debtor. Hutton's claim that manifestly false information was "material" to its decision to allow Hunt to trade is not supported by the evidence.

## C. INTENT

Intent to defraud is often the most difficult element for the plaintiff to prove in a § 523(a)(2) case. The debtor is not going to testify that he intended to defraud the plaintiff. To the contrary, the debtor will plead and testify that at the time of the transaction he "intended" to pay the plaintiff for whatever goods, property or services were obtained.

Analysis of the intent element has produced great diversity among the courts. Some courts have allowed proof of intent through presumptions or inferences. In *H.C. Prange Co. v. Schnore,* Judge Martin held that intent to deceive "may be inferred from the knowing or reckless misrepresentation." 13 B.R. at 252. In *Wybro Federal Credit Union v. Mann,* 22 B.R. 306 (Bkrtcy. E.D.Pa.1982), Judge Goldhaber footnotes the rule that a plaintiff's proof of the first three elements of a false financial statement case under § 523(a)(2)(B) "gives rise to a presumption that the debtor had an intent to deceive and requires the debtor to go forward with evidence that he did not have an intent to deceive." *Id.* at 308, n. 5. The Bankruptcy Court for the Middle District of Tennessee has never adopted the rule that an inference or presumption of bad intent arises from the plaintiff's proof of the other elements of its § 523(a) case. Such a presumption or inference is not required by the language of § 523(a) of the Code or the Federal Rules of Bankruptcy Procedure. The bulk of judicial authority holds that the plaintiff must prove each

---

**21.** Several bankers, and the experts at Hutton's Commodity Credit division in New York appar-ently reached the same conclusion.

individual element of a § 523(a) case.[22] State statutes (criminal or civil) which presume or imply fraud in the presentation of an insufficient funds check cannot be employed to establish fraudulent intent under § 523(a)(2). *See Family Fair, Inc. v. Montebleau,* 13 B.R. at 48; *Monarch Tile Mfg., Inc. v. Anderson,* 10 B.R. 296, 298 (Bkrtcy. W.D.Wis.1981); *Hennessy Cadillac, Inc. v. Green,* 5 B.R. 247, 249 (Bkrtcy.N.D.Ga.1980). However, it is appropriate to note that proof of intent can be accomplished through circumstantial and indirect evidence. *See, e.g., American Express Co. v. Stamps,* BK. NO. 380–03335, ADV. NO. 381–0102 (Bkrtcy.M.D.Tenn. Apr. 15, 1982).

The case law and the legislative history reveal that intent for § 523(a) purposes is actual intent—not an objective, reasonable man standard but essentially a subjective standard requiring an evaluation of the present intent of the debtor at the time of the representations on a case-by-case basis. Some recent decisions interpret § 523(a)(2) to forbid a court from penetrating the debtor's statement of subjective intent to determine its reasonableness. *See Anson v. Hopkins,* 9 B.R. 741. This minority position has been tacitly rejected by other courts which proceed to evaluate the debtor's statement of subjective intent, often concluding that the debtor's statement is "not believable." *See, e.g., In re Black,* 373 F.Supp. 105, 107 (E.D.Wis.1974); *Federated Department Stores, Inc. v. Jordan,* 3 Bankr.Ct.Dec. (CRR) 1292 (Bkrtcy.S.D.Ohio 1977); *Affiliated Bank v. Dyer,* 4 Bankr.Ct. Dec. (CRR) 180, 182 (Bkrtcy.W.D.Wis.1978); *Maas Bros., Inc. v. Ratajczak,* 5 B.R. 583, 586 (Bkrtcy.M.D.Fla.1980); *United Bank v. Kell,* 6 B.R. 695, 699 (Bkrtcy.D.Col.1980). These latter courts must be saying one of two things: either (1) the debtor's credibility has failed and the debtor is found to be a liar; or (2) something other than a subjective standard applies and, measured against this other standard, the debtor's statement of subjective intent is rejected.

The application of an external, nonsubjective standard appears to this court to be contrary to the language and legislative history of § 523(a)(2). The confusing tendancy of some courts to speak in terms of nonsubjective standards results from the fact that even a purely subjective evaluation of intent inevitably, and not inconsistently, involves a mix of subjective and objective considerations. Courts must meticulously maintain distance between the subjective aspects of the analysis and the objective aspects. The purely subjective test may be stated as follows: Did the debtor subjectively intend to defraud the plaintiff? Typically, the plaintiff's proof of the debtor's bad intent concerns the debtor's circumstances and conduct at the time of the transaction and the scheme by which the debtor intended to make good his promises to the plaintiff. Evaluating the debtor's circumstances and conduct inevitably involves objective analysis.[23] The debtor's actions can appear so inconsistent with the debtor's self-serving statement of intent that the proof leads the court to disbelieve the debtor. Pertinent to this inquiry are: (1) facts relating to the debtor's assets and liabilities at the time of dealing with the plaintiff; (2) the history of financial transactions by the debtor; (3) the debtor's income and expenses; (4) the debtor's consultation with professionals concerning his financial condition and/or the filing of bankruptcy; (5) the particular property, goods or services obtained from the plaintiff; and (6) the debtor's demeanor at the time of incurring the challenged debt.

Secondly, the court must objectively analyze the debtor's intended scheme for repaying the plaintiff and determine whether the scheme had a reasonable likelihood of suc-

---

**22.** Some courts have held that proof of intent (and of all the § 523(a)(2) elements) must be "clear and convincing." *See, e.g., Termplan of Missouri, Inc. v. Rauch,* 18 B.R. 97; *Nationwide Financial Corp. v. Smith,* 2 B.R. 276 (Bkrtcy.E. D.Va.1980).

**23.** *See* the excellent analysis of conduct and circumstances in *H.C. Prange Co. v. Schnore,* 13 B.R. at 249.

cess.[24] If the debtor's scheme is objectively reasonable and if the debtor's circumstances and conduct do not otherwise reveal evidence of intent to defraud, the plaintiff will lose the question of intent. However, where the objective unreasonableness of the debtor's proposed technique for repayment of the plaintiff is revealed, the debtor's professed subjective good intent is impuned and the debtor must demonstrate that he subjectively intended to succeed at an unreasonable scheme. This burden is not insurmountable.[25] The burden shifts to the debtor only where it appears that a reasonable man would not have believed in the probable success of the scheme. It is acknowledged that this analysis permits the possibility that an irrational individual would conceive of an impossible scheme for repaying debt and then subjectively believe in a successful outcome. It is consistent with the overall design of the bankruptcy laws for Congress to protect those who in good faith, though based on inflated self-perceptions or miscalculations, enter into commercial transactions and incur debt. In its wisdom, Congress has chosen to allow such people to discharge their debts. Only the individual who subjectively acts in bad faith is to be penalized by a finding of nondischargeability.

▉ In summary, the burden of proof in the sense of going forward with the evidence and in the sense of the weight of the evidence begins on the plaintiff. To over-come the debtor's pleading of subjective good intent, the plaintiff can show from proof of conduct and circumstances that the debtor is not telling the truth, or the plaintiff may demonstrate that the scheme described by the debtor for the repayment of debt is so outrageous that a reasonable person would not expect the scheme to succeed. If the plaintiff meets its burden, then the burden of proof in the sense of going forward with the evidence shifts to the debtor on the issue of intent. The debtor may then prove the truthfulness of his subjective statement of intent by proving circumstances in support of his truthfulness or by showing that in fact he is not the ordinary, reasonable man.

The plaintiffs have failed to prove that Hunt's conduct or circumstances negates his profession of good intent. Contrary to the assertions of plaintiffs' counsel, the issuance of an insufficient funds check by a debtor who knows there is no money in his account is not by itself sufficient proof of intent to defraud for § 523(a)(2) purposes.[26] *See Save-On Oil Co. v. Wise,* 6 B.R. 867, 870 (Bkrtcy.M.D.Fla.1980) ("a NSF check is not, however, conclusive evidence of an intent to defraud, . . ."); *Family Fair, Inc. v. Montebleau,* 13 B.R. at 49 ("the issuance of a check marked N.S.F. has been held not to be a fraudulent misrepresentation . . ."); *Kwinter Realty v. L. Bosco,* 14 B.R. 739, 742 (Bkrtcy.E.D.N.Y.1981) (". . . the issuance of a check with knowledge that the account is

---

**24.** For example, in bad check cases the debtor often knows there is no money in his checking account at the time of writing the check but intends to cover the check by making a deposit before the check is presented for payment at the bank. If the debtor is regularly employed and is immediately entitled to a paycheck which he routinely deposits to his checking account and which is sufficient to cover the outstanding checks, the court might find such a scheme to be objectively reasonable. No other facts appearing, a debtor who intends to cover a check tomorrow by winning the Irish Sweepstakes is acting beyond the standards of a reasonably prudent man.

**25.** One example might be the debtor who at the time of incurring a debt plans a trip to Las Vegas to gamble and expects to win enough money to pay the debt. Such would be an objectively unreasonable scheme and the burden would be on the debtor to come forward with further proof. Conceivably, were the debtor to prove his ability at "card counting" and a long history of success at the card tables, a court might find that the debtor carried his burden. *See Affiliated Bank v. Dyer,* 4 Bankr. Ct.Dec. at 181. In the example above of a debtor intending to cover a bad check by winning the Irish Sweepstakes, what if the debtor proves he holds all of the tickets? What if the debtor's psychiatrist testifies that a television set "told" the debtor he would win the sweepstakes?

**26.** The related principle discussed above, is that an NSF check is not an intrinsically false pretense or misrepresentation under § 523(a)(2)(A).

lacking in funds to cover it ... that alone will not suffice to prove an intent to defraud"); *See also, Anson v. Hopkins,* 9 B.R. at 741; *Montgomery Ward & Co. v. Eason,* 1 B.R. at 604; *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Kurant,* 3 Bankr.Ct. Dec. (CRR) 832 (M.D.Fla.1977).

The cases recognize that a debtor who regularly writes checks knowing there are no funds in the account, but who later makes financial arrangements to cover such checks lacks intent to defraud at the time of delivery of any particular check. *Beasley & Sons v. Berkley,* BK. NO. 75–785 (Bkrtcy.M.D.Tenn. Feb. 7, 1977). *See also Monarch Tile Mfg., Inc. v. Anderson,* 10 B.R. at 298; *Save-On Oil Co. v. Wise,* 6 B.R. at 870 ("... this court is satisfied that the debtor intended to pay Save-On when it signed each of the NSF checks in question ... and the prior course of dealing reveals that a previously dishonored check had been redeposited and paid to Save-On by the debtor.") Hunt's pattern of writing checks to the plaintiffs is consistent with his claim of innocent behavior. A review of the trading records submitted by plaintiffs and the testimony at trial demonstrate that Hunt tendered many checks during the course of his bond trading in 1981. Hunt testified that he had previously delivered checks to Heinold and Hutton knowing that there were insufficient funds in his account. Prior to December 21, 1981, through financial arrangements with his bankers and further trading, Hunt covered every check, with the exception of a single check to Heinold, before it reached his bank. When Hunt failed to timely cover a check issued to Heinold, Hunt immediately substituted a cashier's check and the matter was resolved.

The volume and timing of Hunt's trading do no violence to Hunt's claims of innocent intent. Hunt traded bonds almost daily at both Heinold and Hutton during the Fall of 1981. Hunt had executed many trades prior to December of 1981 which were considered by Stanley and Bowen to be "large" trades. Stanley testified that during the early days, Hunt traded bond futures at Heinold "100–200" at a time, week after week. Bowen testified that it was not unusual for Hunt to trade 50 bond contracts during the day and 50 more overnight. Neither Bowen nor Stanley ever confronted Hunt concerning the size or frequency of his trades. Neither questioned his financial ability to pay his potential losses. The 80 bonds traded at Heinold on December 10 were hardly inconsistent with the prior pattern of trades known to Bowen. Stanley did not testify at trial that he considered the 300 bonds traded by Hunt on December 18 and again on December 21 to be particularly extraordinary. To the contrary, prior to the 300 bond trade of December 21, Stanley and Hunt discussed the impending trade and the two reached an agreement regarding the size and timing of the trade. The magnitude of the risk involved in each transaction undertaken by Hunt was known to the plaintiffs before being undertaken. It cannot be said on these facts that Hunt tricked or induced the plaintiffs into allowing him to take unacceptably large risks.[27]

The plaintiffs' proof regarding the imposition of margin requirements and of credit limits is inconclusive support for plaintiffs' claims of fraudulent intent. In his application to Heinold, Hunt indicated that he had $50,000 available as risk capital for commodity futures trading. More than a year later, in his application to Hutton, Hunt indicated that he had $100,000 of risk capital available. Stanley testified that Hutton required a customer to be back within his credit limits at the end of a trading day.

**27.** Unlike the facts in *Federated Department Stores, Inc. v. Jordan,* 3 Bankr.Ct.Dec. (CRR) 1292 (Bkrtcy.S.D.Ohio 1977) and similar cases, this case is not a "shopping spree" case in which the circumstances of the debtor's transactions with the plaintiffs demonstrate concealment by the debtor. Hunt did not surreptitiously carry out bond trades in either number or frequency such that plaintiffs were not aware what he was doing. The opposite is true. This is not a case where a debtor in poor health and with marginal income, incurs thousands of dollars in debt in a short period of time in incremental small dollar charges. *In re Black,* 373 F.Supp. at 107. *See also United Bank v. Kell,* 6 B.R. at 699; *Maas Bros., Inc. v. Ratajczak,* 5 B.R. at 586; *Affiliated Bank v. Dyer,* 4 Bankr.Ct.Dec. (CRR) at 180.

Bowen testified that he had never known of any rule at Heinold which required a customer to stay within his "risk capital." Bowen said there was no credit limit for Hunt in his trading at Heinold. Stanley testified that Hunt was permitted to trade as many bonds as he wished on a day trade. Stanley and Bowen both testified that it was standard procedure to require a customer to margin a trade in advance of the trade. Bowen indicated that the normal margin was $2,000 per contract. Stanley said that the day trade margin was $1,000 per bond. Both admitted that a customer like Hunt was never required to pay the margin in advance. When Hunt carried bonds in an overnight position, Hutton required margins. The testimony indicated at one point that Hunt met a $100,000 margin call after a 60-bond trade ($1,667/bond). At another point Hunt was required to put up a $200,000 check as margin on 100 bonds carried over the weekend ($2,000/bond). The 300 bonds carried by Hunt from December 21 to December 22 produced a margin call of $300,000 ($1,000/bond). The role of and logic behind margin requirements and credit limit calculations by the plaintiffs remains obscured in the proof. However, there is no proof that Hunt fraudulently induced either plaintiff to waive or alter the credit or margin guidelines in his behalf.

The plaintiffs' contention that the debtor's use of trading accounts at two separate brokerage firms demonstrates the debtor's intent to defraud is wholly unsupported by the proof. Bowen and Stanley both knew that it was Hunt's practice to trade around town with more than one firm. No testimony was offered that either plaintiff would have forbidden Hunt to trade had they known that Hunt was also trading at another brokerage firm. The failure to specifically tell each plaintiff of the existence of the other plaintiff's account is not shown to be either an affirmative misrepresentation or a misrepresentation by omission.[28]

The plaintiffs' proof of Hunt's financial condition at the time of delivery of the checks does not circumstantially demonstrate that Hunt intended to defraud the plaintiffs. The plaintiffs introduced into evidence the debtor's statements and schedules of affairs to support the argument that Hunt was insolvent at the time of delivering the checks and, therefore, could not have reasonably anticipated covering the checks. The schedules demonstrate that many of Hunt's secured and unsecured debts pre-date Hunt's bond trading with Heinold and Hutton. The proof is equally conclusive, however, that prior to December 21, 1981, notwithstanding his substantial indebtedness, Hunt successfully arranged his finances in a manner which allowed him to cover his trading losses. Hunt's financial condition was not shown to have suddenly deteriorated in December of 1981. There was no indication that the family and spousal assets on which Hunt relied were withdrawn or depleted. The statements and schedules at most reveal that Hunt was in debt throughout his trading with plaintiffs, but still managed to meet his obligations.

Only Steele directly questioned the sincerity of Hunt's statement of subjective good intent. Steele characterized Hunt as a conman. Steele's characterization is unsupported by the proof. Hunt's actions after giving the NSF check to Hutton are inconsistent with the actions of a person intending to perpetrate a fraud. Hunt delivered the $95,000 check on the 10th of December. Thereafter, Hunt did not trade at Hutton for more than a week. Although Hunt went to Hutton's offices and was available for trading, he did not take advantage of the opportunity to trade during the first week that his check was being processed by Hutton. A person intending to take advantage of the collection process would not have waited a week before com-

---

**28.** It was suggested in the testimony at one point that brokerage houses always ask their customers whether they have other trading accounts. If such a question was presented to Hunt in the original account applications, no answer was shown to the court and no testimony was elicited to demonstrate misrepresentation by Hunt on this issue.

mencing to trade. The delay is consistent with Hunt's testimony that he intended to analyze the market and go into the market again only at a time that he thought was appropriate. Hutton produced no evidence that Hunt was contemplating bankruptcy, had consulted an attorney regarding bankruptcy, or had undertaken any financial maneuvers indicative of a "conman" at work.

The plaintiffs have also failed to prove the objective unreasonableness of the debtor's intended method of repaying the plaintiffs. Hunt testified that he had tendered insufficient funds checks to the plaintiffs prior to December, 1981. Through a combination of financial arrangements at his bank and further trading, he had always covered the checks. The plaintiffs presented no proof demonstrating the unreasonableness of Hunt's scheme for covering his checks. The plaintiffs offered three witnesses experienced in the bond futures market, but elicited no testimony from any witness regarding the likelihood or unlikelihood of Hunt's success in that market. Stanley testified that Hunt was quite successful in the bond market during the Fall of 1981. There is other testimony that Hunt had experienced losses in the bond market in the past, but had always arranged to cover his obligations. Is the court to presume from the conflicting evidence that it was unreasonable for Hunt to intend to cover his December checks through trading and further arrangements with his bankers? Such would be particularly inappropriate because the plaintiffs also presented no evidence regarding Hunt's relationship with his bankers. It should be recalled that Bowen and Hutton's credit investigators had consulted with those same bankers to determine that Hunt's finances were strong and in order. The burden of proving the objective unreasonable of the debtor's intended repayment scheme rested with plaintiffs. The only proof offered was that Hunt had consistently succeeded in his financial arrangements in the past.

The evidence relative to the debtor's professed scheme for covering his debts does not demonstrate such a departure from reality or such unreasonableness that the debtor's good intentions should be disbelieved. An example of an unreasonable scheme is found in *Southeast First National Bank v. Torrens,* 7 B.R. 229 (Bkrtcy.S.D.Fla. 1980). In *Torrens,* the debtor obtained a $3,500 advance from a bank in order to cover the debtor's check in that amount based on the representation that the debtor would deposit funds sufficient to cover the check. The debtor testified that he intended to obtain the funds by depositing commissions owed by a business associate. The court found that there was no proof that the debtor was entitled to any commissions or had any other source of income. The business associate who allegedly owed the commissions did not testify at trial. The debtor did not prove any pattern of successfully earned and deposited commissions in the past. The court consequently rejected the debtor's statement of good intent. Unlike *Torrens,* in the case at hand, there is proof corroborating the success of Hunt's method for covering his checks.

The facts of this case are more akin to those found in *Montgomery Ward & Co. v. Eason,* 1 B.R. 604. In *Montgomery Ward,* the court rejected the creditor's argument that the issuance of a check known by the debtor to be backed by insufficient funds was an intentional fraud under § 17a(2) of the Bankruptcy Act of 1898. The court first concluded that:

> [F]alse representation or false pretense ... must be of a kind involving moral turpitude or intentional wrong; fraud implied in the law is insufficient ... "actual fraud," as opposed to fraud implied in the lower constructed fraud, requires intentional wrong or moral turpitude, ... and it is only this type and degree of fraud that may operate to avoid discharge in bankruptcy. (citations omitted).

*Id.* at 607. The court then analyzed the debtor's intended scheme for covering the check as follows:

[T]he mere writing of a check not backed by sufficient funds and the fact that at the time it was uttered [the debtor] was aware of this fact is not enough to justify finding of intentional fraud. [The debtors] uncontroverted testimony was that on several occasions he mailed checks to Montgomery Ward with insufficient funds in his account; that he would sell the inventory subsequently received along with merchandise already in the store and then he would deposit the proceeds in the account from which the checks were to be drawn with the expectation that by the time the checks had processed through banking channels and were presented for payment, the funds on deposit would be ample to support the checks.

*Id.* From these facts the court found evidence of the debtor's good faith and honest intentions to pay Montgomery Ward at the time of delivery of the NSF check. Analysis of Hunt's method for covering the checks to the plaintiffs requires a similar finding.

At the time Hunt tendered the checks, he was optimistic about the bond market and about his ability to cover the checks.[29] The plaintiffs did not argue that Hunt's optimism was feigned or unrealistic. The debtor's continued optimism and commitment to the technique he had used in the past is inconsistent with the plaintiffs' theory that the debtor intended to defraud the plaintiffs. The fact that the debtor's hopes did not materialize does not demonstrate that the debtor intended to defraud the plaintiffs at some prior time. In *In re Stein,* 4 Bankr.Ct.Dec. (CRR) 58 (Bkrtcy.S.D.N.Y. 1978), the debtor presented an insufficient funds check in the sum of $55,966 to pay deficits in a trading account at a brokerage firm. Not unlike the facts herein, the plaintiff brokerage firm was aware at the time of delivery of the check that there were problems with the debtor's checking account. The court held that the plaintiff had failed to establish the intentional fraud

necessary to a finding of nondischargeability:

The plaintiff has failed to prove that when the bankrupt placed the purchase orders for the IBM options he did not intend to pay for them. On the contrary, the plaintiff's vice president, ... conceded that the bankrupt was bullish, or optimistic with respect to the IBM purchases and that is why the sell side never went off.

It is clear that the bankrupt and the plaintiff participated in a very complex and sophisticated and speculative venture. The bankrupt profited from his share ... [T]he plaintiff profited from the brokerage commissions on the numerous transactions ... Both parties entered these speculative deals with their eyes wide open. That the bankrupt's high hopes did not materialize does not suffice to characterize a well intentioned transaction as a fraud or misrepresentation. Both parties were aware of the risk.

*Id.* at 60.

Hutton directed no separate attention to the issue of intent as it related to the false financial statement. Other than the statements and schedules of affairs and copies of debt instruments listed therein, no evidence was presented regarding Hunt's financial condition or credit problems in September of 1981. The financial statement was substantially separate in time from the losses incurred by Hutton. It is Hutton's position that Hunt had intent to defraud at the time of delivery of the financial statement in September. There is no evidence, however, that the financial statement was part of any such long term scheme. Between the delivery of the statement and the December trades, Hunt traded voluminously at Hutton and always covered his losses with good funds. Hunt's admission to Stanley that the statement was incomplete is inconsistent with Hutton's theory that Hunt delivered the statement with an intent to de-

---

**29.** Unlike *Bache, Halsey, Stuart & Shields, Inc. v. Greenwald,* 2 B.R. 35 (Bkrtcy.S.D.Fla.1979), this is not a case where the plaintiffs have proven such desperation by the debtor that the debtor's statement of intent should be disbelieved.

fraud. Hunt gave Hutton full permission to investigate his financial affairs and Hutton did so. Hutton was fully aware that the financial statement did not reflect all of Hunt's liabilities. Hunt's explanation of how he arrived at the numbers on the financial statement is not unbelievable. A review of the schedules reveals that it was Hunt's practice to make use of family assets and the signatures of his wife and mother in his financial affairs. Several of the loans shown in the schedules are cosigned by his mother and by his spouse. Several of the loans originate with businesses owned by his family. Several of Hunt's loans are secured with liens on property belonging to other members of his family. No intent to deceive or defraud emerges from the financial statement transaction.

### D. RELIANCE

The proof regarding plaintiffs' reliance on the checks and financial statement is insufficient to support a judgment of non-dischargeability. As detailed above, the plaintiffs must demonstrate actual reliance which was reasonable and justifiable under the circumstances. *Bank of Waynesboro v. Yeiser,* 2 B.R. 98 (Bkrtcy.M.D.Tenn.1979). The plaintiffs have not met this burden.

At the threshold, there is a substantial logic barrier to the plaintiffs' argument that they reasonably and justifiably relied on the $15,000 and $95,000 checks. These checks were not offered to Heinold or Hutton as margin payments for future trades. As Bowen and Stanley explained, their business relationships with Hunt did not include a requirement that Hunt comply with the Board of Trade regulation regarding margin in advance of trading. Rather, Hunt was only required—and even then not always required—to cover any deficit in his trading account before placing further trades. Thus, the checks were not delivered by Hunt as inducements for future trading,

but were in payment of his antecedent debts to plaintiffs.

The courts have correctly recognized that where a check is delivered in payment for goods or services that have already been supplied, reliance on the check is absent. *Save-On Oil Co. v. Wise,* 6 B.R. at 867; *Hurlbert v. Drake,* 5 B.R. 149 (Bkrtcy.D.Idaho 1980). In *Wise,* for example, the debtor was a service station operator who had a contractual arrangement with a gasoline wholesaler. The debtor would sell gasoline and deposit the receipts in a bank account. Each week, the debtor would pay the wholesaler for the gasoline sold during the previous week. The wholesaler would then fill the debtor's tanks for sales in the following week. At some point, the debtor paid the wholesaler with a check returned for insufficient funds. The station operator subsequently filed for bankruptcy. As in this case, the wholesaler then brought a complaint to bar the dischargeability of the debt under § 523(a)(2). The court found the debt dischargeable observing as follows:

> The record further reveals that the method of payment utilized in this case, to wit: a check, was always written to cover deliveries actually made during the previous week and it is, therefore, difficult to fathom the role, if any, the particular NSF checks in question played in the [plaintiff's] decision making process to deliver gasoline to the station. Under such circumstances, this court is satisfied that [the plaintiff] has not demonstrated sufficiently, within the meaning of § 523(a)(2), that it reasonably relied on the representation made by the debtor when the debtor signed the NSF check.

*Id.* at 870.[30] Similarly, in *Drake,* the debtor sold motor vehicles on consignment. At a time when the business was failing, the debtor accepted vehicles on consignment from several plaintiffs. The debtor sold these vehicles and delivered checks to the

---

**30.** Judge Paskay in *Save-On Oil Co. v. Wise* goes on to observe that "[M]oreover, no money or property was obtained by the debtor as a result of NSF checks since the checks were merely presented in an attempt to pay antecedent debts." 6 B.R. at 870. This argument is equally applicable herein.

plaintiffs either in full or partial payment of the consignment price. The checks did not clear the debtor's account. In addition to finding that there was no proof that the debtor "received plaintiffs' vehicles with the then existing and deliberate intent to convert the proceeds of consigned vehicles," the court also observed that:

The insufficient fund check issued to plaintiff . . . in payment of his antecedent debt . . . does not amount to fraud . . . [T]he misrepresentation was subsequent to the obtaining of the motor vehicles from plaintiff . . . and was merely an attempt to pay an antecedent debt. (citations omitted).

5 B.R. at 151.

The analysis in *Drake* and *Wise* is particularly applicable in this case. Hunt and the plaintiffs had long-standing business relationships whereby, Hunt was permitted to make his payments to the plaintiffs in arrears. Hunt was not required to margin his trades in advance. Rather, he was required only to pay the deficits in his account after credit had been extended and the risk of trading allowed. This arrangement is inconsistent with the plaintiffs' contention that they relied on the $15,000 check and the $95,000 check for days or weeks into the future.

Plaintiffs' claims of reasonable reliance on the checks are negated by the grossly disproportionate credit given to Hunt.[31] On the day the $15,000 check was delivered to Heinold, Bowen allowed and assisted Hunt in trading 80 bonds. Hunt was thus permitted to risk a loss of $160,000 ($2,000/bond/day). It is an implausible

contention that Heinold accepted the $15,000 check as a hedge, reserve or expression of good faith against the risk of a $160,000 loss. Bowen knew that it would be more than a week before he would know if the $15,000 check was honored by Hunt's bank. Heinold was relying on factors other than the $15,000 check in its decisions to allow Hunt to trade bonds.[32] Otherwise, Heinold would have required a realistic margin from Hunt *in advance* of allowing the 80 bond trade. Bowen's testimony that the $15,000 check was a fundamental prerequisite to the 80 bond trade on December 10 is simply not credible.

Hutton's claim of reliance on the $95,000 check is equally illogical and unbelievable. At the time of delivery of the $95,000 check, Stanley was on notice that arrangements had to be made relative to Hunt's bank account. Stanley knew that Hunt's check would take a substantial period of time to clear the Hutton collection process. The $95,000 check was payment of the deficit in Hunt's account, and not a margin against future trades. Hunt was allowed to make a 300 bond trade on December 18, 1981 with an attendant risk of loss in excess of $600,000. It is not reasonable for Hutton to claim reliance where the exposure in the next decision to allow a trade is gigantic compared to the antecedent debt that has been paid. It should be remembered that this first $600,000 risk was followed on the next business day by Stanley's decision to allow Hunt to risk a loss of equal magnitude. The second 300 bond trade came after Hunt had delivered to Stanley a $200,000 check with the same admonition: Hunt

---

**31.** Allowing a bond futures trader to trade without advance margin is not unlike an extension of credit by the brokerage firm. If the trader incurs losses, the brokerage house must depend on the trader's financial resources for reimbursement. The losses must be covered by the brokerage firm in any event. Thus, a deficit in a trader's account is similar to a loan.

**32.** The proof is conclusive that the $15,000 check delivered to Heinold on December 10 played an insignificant role, if any, in Bowen's decision to allow Hunt to trade further. Bowen knew that Hunt had a lengthy trading relationship with Heinold, with Clayton and with other

brokers. He always covered his losses with good funds. Bowen testified that he had "many times" verified Hunt's financial ability with Hunt's bankers. Bowen had called Hunt's bankers in Trenton, Tennessee and in Nashville. All gave Hunt excellent ratings. Bowen's business relationship with Hunt stretched over a substantial period of time and Bowen testified that Hunt had many, many times delivered substantial sums of money to Bowen in payment of deficits in his account. Bowen had discussed with Hunt his property and his family and he believed he knew Hunt's financial condition from his own investigation.

asked Stanley to hold the $200,000 check to allow Hunt time to make financial arrangements to cover the check. Hutton cannot reasonably contend that it was "relying" on the $95,000 check on December 21 when it again allowed the debtor to undertake a $600,000 risk.[33]

As the cases indicate, where the plaintiff has previously received an NSF check from the debtor but chooses to accept a personal check again, the plaintiff is on notice as to the state of the debtor's checking account and will not be heard to claim reliance on the subsequent personal check. In *Sanitation Recycling, Inc. v. Jay Peak Lodging Assoc., Inc.,* the debtor purchased portable toilets from the plaintiff pursuant to an arrangement allowing the debtor to pay half of the purchase price at the time of delivery and the balance some days later. The debtor tendered the first half payment by check. 428 F.Supp. 1022. The plaintiff became aware that the check was not covered by sufficient funds. Despite this knowledge, the plaintiff delivered the toilets and accepted a second check from the debtor in full payment of the contract. This check, too, was returned for insufficient funds. The bankruptcy court found that this chain of events did not constitute grounds for nondischargeability under § 17a(2) of the former Act. The district court affirmed the bankruptcy court and observed that:

> [P]laintiff did not rely on defendant's promises to his detriment and cannot now support the claim that he was the unsuspecting victim of positive fraud. After plaintiff discovered that the first check was dishonored, he was on notice as to

the questionable state of defendants' checking account, and could easily have avoided being taken advantage of.

*Id.* at 1024–1025. Similarly, in *In re Stein,* 4 Bankr.Ct.Dec. (CRR) 58, the debtor and the plaintiff were engaged in a complicated scheme for trading stock options. The debtor tendered an NSF check in the amount of $55,966. The plaintiff was aware that this check could only be covered through continued trading and subsequent deposits to the debtor's bank account. The court found that the plaintiff knew or should have known that it could not rely on the check. From these facts, the court held that the plaintiff had failed to prove that it had "relied upon an implied representation that the bankrupt had sufficient funds to cover the checks issued for his previously given purchase orders." *Id.* at 61. The same factors are present in the case at hand. Heinold had previously received an insufficient funds check and had required the debtor to cover that check and subsequent checks with cashier's checks. Stanley was informed at the time of delivery of the $95,000 check and at the time of delivery of the $200,000 check that Hunt had to make arrangements to cover the checks. Plaintiffs were on notice as to the state of the debtor's checking account.

The plaintiffs' claims of reliance are further eroded by the fact that the business relationship between Hunt and the plaintiffs was in essence an agreement to engage in a speculative, high risk enterprise. The plaintiffs could have structured this business arrangement so that only the customer would be at risk by requiring mar-

---

**33.** It is not clear what rational claim of reliance Stanley could make for his conduct in permitting Hunt to take a 300 bond position on December 18 and then again on December 21. It appears that at some point in the course of trading at Hutton, Hunt and Stanley developed more than the ordinary business relationship between a broker and a trader described by Stanley's boss, Mr. Steele. Stanley and Hutton were earning large commissions from Hunt's trading throughout this period. It appears that Stanley was willing to take substantial risks on his own behalf and on behalf of his company. Stanley testified that it was his understanding that Hunt was worth approximately $650,000.

Using Stanley's own analysis, on December 18 —when Stanley permitted Hunt to assume a 300 bond position—Hunt had at risk his entire net worth. Had the market gone the maximum on December 18, Hunt could have experienced losses in excess of $600,000. Coupled with the $95,000 Hunt had just delivered to Stanley a week earlier, Stanley could only have been aware that $695,000 would be due from Hunt. Stanley thus claims reliance on a $95,000 check written a week earlier as proof that Hunt could, a week later, assume a risk equivalent to his entire net worth. The proof simply does not support Hutton's blind claim of reliance.

gins in advance of trading, by limiting Hunt to small trades or by verifying the condition of Hunt's checking account before allowing Hunt to trade again. Where both parties are aware of the risk, where the risk involved in the venture is great and where the lender knows or should know that the success of the venture is a factor in the facility with which the debt would be repaid, the lenders' claims of innocent reliance are most suspect. *See In re Stein*, 4 Bankr.Ct.Dec. (CRR) at 60.

The elusive quality of Hutton's reliance on Hunt's checks is demonstrated by the fact that Hutton eschews all reliance on the $200,000 check given by Hunt to Stanley at Hunt's home on either December 18 or 19. Instead, Hutton argues its entire claim stems from the $95,000 check of December 10, or from the financial statement of September 29. This denial of reliance on the $200,000 check is revealing. Hutton manifestly cannot purport to claim reasonable reliance on Hunt's $200,000 check. Every indication pointed to the fact that the check was not covered by sufficient funds and would not be covered by December 21. The overwhelming bulk of Hunt's losses, however, occurred on the December 21st trade—the second 300 bond trade—after Hutton accepted the $200,000 check. Hutton thus takes the curious position that it does not rely on Hunt's intervening $200,-000 check in its decision to allow Hunt to trade 300 bonds for the second time on December 21 but insists on continuing reliance between December 10 and December 21 on the $95,000 check. These observations became but more curious in light of the fact that Stanley demanded and received Hunt's personal check for $300,000 on December 21 *after* delivery of the unrelied-upon $200,000 check and *after* Stanley knew that Hunt's $95,000 check had been returned for insufficient funds. Most charitably it can be said that Hutton's claims of reliance on Hunt's checks are convenient, but inconsistent.

Hutton's claim of reliance on the September 29 financial statement is refuted by the testimony of Stanley and Steele. At the time of delivery of the financial statement, Hunt told Stanley that the financial statement was incomplete. Hutton conducted its own investigation and became aware that the financial statement was inaccurate, that the financial statement failed to list all of Hunt's liabilities and that the financial statement was a reflection of Hunt's "family" wealth. Hutton nonetheless decided to extend substantial credit to Hunt. Neither Stanley nor Steele required Hunt to make any corrections or to provide any clarification of the errors known to them.

A lender cannot claim reasonable reliance on a financial statement that the lender knows is inaccurate or incomplete—particularly where the lender has information in its own files that confirms the inaccuracies and shows the need for further investigation or confrontation with its customer. The cases so holding are legion. *See, Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971); *Bryn Mawr Trust Co. v. Klein*, 20 B.R. 119 (Bkrtcy.E.D.Pa.1982); *Peoples Security Finance, Inc. v. Aldrich*, 16 B.R. 825 (Bkrtcy.W.D.Ky.1982); *Thomson-Macconnell Cadillac, Inc. v. Isaacs*, 15 B.R. 210 (Bkrtcy.S.D.Ohio 1981); *Beneficial Consumer Discount Co. v. Keppel*, 14 B.R. 479 (Bkrtcy.E.D.Pa.1981); *Waterbury Connecticut Teachers Federal Credit Union v. Ciampi*, 14 B.R. 441 (Bkrtcy.D.Conn.1981); *Waterbury Community Federal Credit Union v. Magnusson*, 14 B.R. 662 (Bkrtcy.N.D.N.Y.1981); *Lincoln First Bank v. Tomei*, 12 B.R. 592 (Bkrtcy.W.D.N.Y.1981); *Nationwide Financial Corp. v. Smith*, 2 B.R. 276 (Bkrtcy.E.D.Va.1980); *Affiliated Bank v. Dyer*, 4 Bankr.Ct.Dec. (CRR) at 180. As this court observed in *Bank of Waynesboro v. Yeiser:*

This creditor cannot assume the position of an ostrich with its head in the sand and ignore facts which are readily available to it... Yet this apparently was just what occurred in this instance. No questions were asked concerning any of the information appearing in the statement. No search was made of any of the readily available public records to verify the status of the title of the real property. (citations omitted).

2 B.R. at 101. As the court stated in *Nationwide Financial Corp. v. Smith,* "A creditor may seek to rely on the statement after bankruptcy ensues, but in light of a careless disregard for obvious 'red flags' of warning did not, in truth, act reasonably ..." 2 B.R. at 279. In *Affiliated Bank v. Dyer,* 4 Bankr.Ct.Dec. (CRR) at 180, the debtor obtained a credit card from the plaintiff after filling out an application which contained two spaces for the listing of unsecured creditors. The debtor listed three unsecured creditors totaling approximately $4,500. In fact, the debtor owed unsecured creditors more than $10,000. Prior to mailing the debtor his credit card, however, the bank communicated with the unsecured creditors listed on the debtor's application and learned the correct amounts. The court found this dispositive of the plaintiff's claim that the false financial statement barred the dischargeability of the debt. The court noted:

> Knowing at the outset that the defendants' financial statement was inaccurate, the plaintiff had no right to rely on it ... Proof of the essential element of reliance is lacking ... (citations omitted).

*Id.* at 182. In *Bryn Mawr Trust Co. v. Klein,* 20 B.R. at 119, the debtors had a long-standing business relationship with the plaintiff bank involving several loans. Each time the debtor would get a loan from the bank, the debtor would fill out a credit application. In applying for the last two loans obtained from the bank, the debtors apparently failed to list on the application approximately $22,000 owed to other banks, relatives and department stores. The bank sought a determination of nondischargeability pursuant to § 523(a)(2)(B). The court first found that from an examination of information available to the bank—including prior credit applications filed by the debtors—the bank could have determined that the debtors had not listed all of their debts on the final credit applications. The

court held that the debts were dischargeable:

> [W]e find that the evidence presented does not support a conclusion that the bank reasonably relied on the debtors' credit application in granting the loans in question. In the instant case, the bank and the debtors had had a history of satisfactory financial dealings for over eighteen years. We conclude that the bank relied on that history in deciding to grant further loans to the debtors. However, even if the bank did rely in part on the credit applications in question, we conclude that the reliance was not reasonable. Where the bank had available in its own files information ... which would lead a reasonable lender to investigate further into the debtors' financial condition, we conclude that it was unreasonable for the bank not to have done so.

*Id.* at 122.

▇▇▇▇ Where a creditor requires a financial statement, but his actions or use of the information indicate that the statement is merely a facade or formality and not a serious attempt to analyze the financial condition of the debtor, the creditor cannot claim reasonable reliance on the financial statement.[34] As this court observed in *Bank of Waynesboro v. Yeiser,* quoting from *Northwestern National Bank v. Halvorson,* 8 Collier Bankr.Cas. 1 (MB) (D.Minn.1976):

> Bankrupt's deceit, however, does not give rise to a conclusion that the bank relied upon the misleading financial picture depicted in the March 22, 1974 statement ... In this instance, the loan officer accepted the statement which he knew was incomplete. If he were relying on this statement, would not this fact ordinarily impel him to inquire further? Instead, without security, he accepted this statement in the manner of *pro forma* record keeping as though some type

---

**34.** Hutton's initial dealings with Hunt suggest that the financial information was inconsequential. Notwithstanding the policy that a potential customer's financial condition must be evaluated by Commodity Credit before a customer is allowed to open a trading account, Hunt was allowed to place a 60 bond trade with Hutton on the day after delivering the financial statement.

of statement was necessary to complete his file. The mere acceptance of this cursory statement leads one to wonder what import the Bank itself ascribes to the form it devised. One ponders the Bank's purpose in obtaining and accepting this statement. Was the Bank genuinely interested in obtaining a written statement of bankrupt's financial condition ...? Certainly the statement did not even approach fulfilling [this end]. 2 B.R. at 102. The same characterization applies to the Hutton financial statement. The statement contains but a handful of lines divided into summary categories with no space provided for detail and no room for any supporting information. As the court observed in *Affiliated Bank v. Dyer,* where a lender supplies a borrower with a form which provides no space for detail and little space for anything more than a summary of the debts and assets of the debtor, the lender must overcome the obvious inference that the financial statement was a less than serious effort by the lender to get substantial, accurate and detailed information from the debtor. 4 Bankr.Ct.Dec. (CRR) at 182. Further, the courts have recognized that where the lender, through its use of forms and dealings with the debtor, leads the debtor to believe that the lender does not want the debtor to reveal all there is to know about the debtor's financial condition, the lender cannot thereafter complain when it is revealed that the debtor in fact summarized or selectively revealed financial information. *See Bryn Mawr Trust Co. v. Klein,* 20 B.R. at 121–122. Hutton's use of such a cursory and inadequate form, particularly in light of the gigantic risks of loss that Hutton thereafter allowed Hunt to undertake, indicates that Hutton attached limited importance to the financial information form.[35]

### CONCLUSION

The plaintiffs have failed to carry their burden of proof in several respects. The insufficient funds checks, standing alone, will not support the plaintiffs' dischargeability complaint pursuant to § 523(a)(2)(A). The plaintiffs have failed to prove any other false pretenses or misrepresentations. The plaintiffs have not shown Hunt's statement of intent to repay to be unbelievable nor have they demonstrated the objective unreasonableness of Hunt's intended plan for repayment. The plaintiffs' claims of reliance on the checks and the financial statement are not credible or reasonable and are refuted by the proof. For all of these reasons, I recommend that the complaints objecting to dischargeability be dismissed.

---

**35.** The cases recognize that "partial reliance" on a financial statement, in concert with other factors, may suffice for § 523(a)(2)(B) purposes. However, the partial reliance cases must be read most carefully. These cases do *not* stand for the proposition that a creditor can overcome the unreasonableness of its reliance by claiming only "partial" dependence on the financial statement. As the court observed in *Nationwide Financial Corp. v. Smith,* "Partial reliance ... may not be seized upon to fill a gap caused by unreasonable reliance." 2 B.R. at 279.