In re Timothy Don MILLER, Debtor.

**GEORGIA CASUALTY AND SURETY CO., Columbus Auto Auction, Inc., Plaintiffs,**

v.

**Timothy Don MILLER, Defendant.**

Bankruptcy No. 87–10715.
Adv. No. 87–1073.

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

June 7, 1989.

Thomas A. Gross, Marion, Ind., for plaintiffs.

Bruce A. MacTavish, Seymour, Ind., for defendant.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

It is often advisable to periodically balance one's check book. If not, checks are apt to bounce because they have been written against insufficient funds. When this scenario is followed by a Chapter 7 bankruptcy, the result may also be a challenge to the dischargeability of the debt represented by the dishonored check. This adversary proceeding is such a case.

Plaintiffs hold two checks which were issued by the debtor to Columbus Auto Auction. Both checks were issued in October, 1985, and were given in payment of motor vehicles purchased from the Auto Auction. The first was issued on October 14, 1985, in the sum of $4,730.00. The second was issued on October 28, 1985, in the sum of $1,230.00. Both checks were dishonored by the bank upon which they were drawn. When they were presented, there was not sufficient money in debtor's account with which to pay them.

Plaintiffs have challenged the dischargeability of debtor's obligations, as represented by these two checks, based upon § 523(a)(2)(A) of the Bankruptcy Code. This portion of the Bankruptcy Code excepts from discharge

Any debt—

\* \* \* \* \* \*

for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by —

(A) false pretenses, false representation, or actual fraud.... 11 U.S.C. § 523(a)(2)(A).

All of the underlying facts and other evidence with regard to the transactions in question have been submitted to the court by way of stipulation. These facts can be summarized as follows.

Until his business failed, the debtor was engaged in the wholesaling of used cars. This business was conducted as a sole proprietorship under the name of "Midwest Motor Car." Vehicles would be purchased, frequently at auction, and then resold by the debtor either to a dealer or through a subsequent auction. Plaintiff, Columbus Auto Auction, Inc., as its name implies, operates an automobile auction through which the debtor would buy and/or sell his vehicles.

On October 14, 1985, the debtor received delivery of a 1984 Pontiac which he had purchased at the Auto Auction. The auction price was $4,730.00. As full payment

of the amounts due, the debtor tendered a check to the Auto Auction. When this check was presented to his bank for payment, on October 28, it was dishonored due to the lack of sufficient funds.

On October 28, 1985, Plaintiff accepted delivery of a 1976 Pontiac Firebird which he had purchased at the auction. As full payment of the $1,230.00 auction price, he tendered his check in this sum on that date. This check also was dishonored, due to insufficient funds, when it was presented to the debtor's bank for payment.

Plaintiff, Georgia Casualty and Surety Co., is the Auto Auction's insurance carrier. Under the terms of its policy with the Auto Auction it was required to pay the loss sustained because of the debtor's checks. As a result, it has received an assignment of all the Auction's claims against the debtor by virtue of the checks in question and is fully subrogated to the auction company's rights.

There is no dispute that the checks in question were dishonored due to insufficient funds. Instead, the debtor defends against Plaintiffs' claims based upon the proposition that he believed there was enough money in his account to cover the checks when they were written.

■ Section 523(a)(2)(A) excepts from discharge debts which arise out of false pretenses, false representations, or actual fraud. Whether or not a debtor's actions constitute this type of prohibited conduct is a question of federal law. In order to prevail on a claim of non-dischargeability, pursuant to § 523(a)(2)(A), Plaintiff must prove each of the following five elements:

(1) that the debtor made materially false representations;

(2) that the debtor knew the representations were false at the time he made them;

(3) that the debtor made the false representations with the intention and purpose of deceiving the creditor;

(4) that the creditor reasonably relied upon the debtor's materially false representations; and

(5) that the creditor sustained loss and damages as a proximate result of the materially false representations by the debtor. *In re Hunt,* 30 B.R. 425, 435 (M.D.Tenn.1983). *See also In re Hunter,* 780 F.2d 1577, 1579 (11th Cir. 1986); *In re Houtman,* 568 F.2d 651, 656 (9th Cir.1978); *U.S. v. Singleton,* 91 B.R. 604, 607 (Bankr.N.D.Fla.1988); *In re Hicks,* 79 B.R. 45, 48 (Bankr.N. D.Ala.1987); *In re Gans,* 75 B.R. 474, 482–83 (Bankr.S.D.N.Y.1987); *In re Edwards,* 67 B.R. 1008, 1009–10 (Bankr.D.Conn.1986).

"The failure to prove any one element is fatal to a plaintiff's case." *In re Gans, supra,* 75 B.R. at 483. Plaintiff must prove each by clear and convincing evidence. *In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985); *Matter of Carpenter,* 53 B.R. 724, 729 (Bankr.N.D.Ga.1985); *In re Love,* 47 B.R. 213, 215 (Bankr.W.D.Mo. 1985).

When a check is issued and subsequently dishonored due to insufficient funds, the obligation it represents may or may not be a dischargeable debt. Dischargeability depends on upon the circumstances under which the check was given. Where a debtor purchases on credit and subsequently pays the amount due with an NSF check, the obligation represented by the check is probably dischargeable. Courts reach this conclusion by recognizing that the original extension of credit and the subsequent attempt at payment, with an NSF check, represent two distinct transactions. Consequently, they conclude that the creditor could not have relied upon any representations, which might accompany the presentation of a check, when it extended credit because credit was extended well before the check was presented. *See In re Hunt, supra,* 30 B.R. at 447; *In re Miles,* 29 B.R. 8, 10 (Bankr.W.D.Ky.1983); *Matter of Wise,* 6 B.R. 867, 870 (Bankr.M.D.Fla.1980).

Where the purchase and the presentation of the check are part of a single transaction, the obligation represented by the dishonored check may be non-dischargeable, if all of the required elements are met. Courts reach this conclusion by recognizing that neither of the parties intended to enter

into a credit transaction and that the only reason a debtor was given possession of the property purchased was because he had apparently paid the required price. Only later does the creditor realize that payment has not been made because the check it received is no good.

■ This court agrees with those decisions which recognize that the contemporaneous purchase and the delivery of a check drawn against insufficient funds may give rise to a non-dischargeable debt. The delivery of a check carries with it the implied, if not the actual, representation that it will be honored by the bank upon which it is drawn or that there are sufficient funds in the account with which to pay the check.[1] Where the check is subsequently dishonored, this representation proves to be false. Thus, there are two elements on which "NSF" check cases generally focus. They are: (1) was there fraud or an intentional wrong by the debtor; and (2) did the creditor reasonably rely on the validity of the check. *In re Mullin, supra,* 51 B.R. at 379; *Matter of Anderson, supra,* 10 B.R. at 297–98.

Where the debtor actually knows that the check will be dishonored (or should reasonably know that the check will be dishonored) he may be found to have made the false representation with the intent to commit fraud.[2] *See In re Kurdoghlian, supra,* 30 B.R. at 502, *In re Mullin, supra,*

51 B.R. at 378; *In re Tabers, supra,* 28. B.R. at 681; *Matter of Anderson, supra,* 10 B.R. at 298. The fact that the seller parts with possession of goods or property upon delivery of the check may constitute reasonable reliance upon the debtor's representation of payment. Thus, when the check ultimately bounces, the creditor has sustained a loss as a result of the debtor's false representations, in an amount equal to the face amount of the check.

In this case, there is no question concerning Plaintiff's losses or its reasonable reliance as a result of receiving Debtor's checks. Furthermore, there is no question concerning the falsity of the representations which were made when the debtor issued the checks. Instead, as in many NSF check cases, the primary issues before the court concern Debtor's knowledge that the checks had been written against insufficient funds and whether or not he intended to deceive the auto auction. This is a question whose answer may and frequently can only be inferred from the circumstances surrounding the entire transaction. *In re Kurdoghlian, supra,* 30 B.R. at 502; *In re Roberts,* 82 B.R. 179, 184 (Bankr.D. Mass.1987).

Debtor's troubles with his checking account began in July of 1985. Beginning at this time, his bank began to receive checks which were drawn against insufficient

---

1. This court recognizes the split of authority concerning whether the mere giving of a check that is subsequently dishonored, without more proof, is an actionable representation under § 523(a)(2)(A). Some courts have held that the issuance of a check carries an implied representation by the issuer that it will be honored or that there are sufficient funds available to cover the check. *See In re Almarc Mfg., Inc.,* 62 B.R. 684, 689 (Bankr.N.D.Ill.1986); *Matter of Perkins,* 52 B.R. 355, 357 (Bankr.M.D.Fla.1985); *In re Mullin,* 51 B.R. 377, 378 (Bankr.S.D.Ind.1985); *In re Kurdoghlian,* 30 B.R. 500, 502 (9th Cir.B.A. P.1983); *In re Tabers,* 28 B.R. 679, 680 (Bankr. W.D.Ky.1983); *Matter of Anderson,* 10 B.R. 296, 297 (Bankr.W.D.Wis.1981); *In re Kurant,* 3 B.C.D. 832, 14 C.B.C. 783 (Bank.M.D.Fla.1977). Other courts have held that a check is not a statement or representation as to whether it will be honored upon presentment. *See In re Jenkins,* 61 B.R. 30, 39–40 (Bankr.D.N.D.1986); *In re Hammett,* 49 B.R. 533, 534–35 (Bankr.M.D. Fla.1985); *In re Younesi,* 34 B.R. 828, 829

(Bankr.C.D.Cal.1983); *In re Hunt, supra,* 30 B.R. at 437–38; *In re Paulk,* 25 B.R. 913, 917 (Bankr. M.D.Ga.1982). We, however, side with the cases that hold an issued check carries with the implied representation that it will be honored. If nothing else, this gives effect to the commercial realities and expectations which accompany payment by check.

2. We cannot rely upon the provisions of I.C. § 35–43–5–5(c) as a basis for concluding that Debtor knew the check would not be honored or that he intended to deceive Plaintiffs. The fraud condemned by § 523(a)(2) must be actual and may not be presumed. *See In re Burgstaler,* 58 B.R. 508, 514 (Bankr.D.Minn.1986) (*contra In re Mullin, supra,* 51 B.R. at 379). *See also Matter of Anderson, supra,* 10 B.R. at 298. Consequently, the mere fact that the creditor received a check that was subsequently dishonored does not demonstrate that it was given with the intent to deceive.

funds. Debtor attributes this to the fact that he received a check, in the sum of $6,500.00, which was itself dishonored.

Debtor's bank never honored checks which were drawn against insufficient funds. It would, instead, return them. Upon doing so, it would mail a notice to the debtor advising him that on a certain date his account contained a specific balance and that checks exceeding this amount had been presented for payment. This notice further informed the debtor which checks had been dishonored, as well as the amount of any charges that had been made against the account because of them. The notice also advised that if the bank's stated account balance did not agree with the check register, the debtor could contact them for assistance and clarification.

The debtor's problems with NSF checks began, as indicated, in July of 1985 and continued with some regularity through August, September, and October of that year. In addition to receiving the periodic notices concerning NSF checks, debtor also received monthly statements from his bank concerning the status of this account.

In spite of the monthly statements and periodic NSF notices, the debtor was not in the habit of balancing his check book, with any degree of regularity—if ever. Rather than verifying the status of his account, as indicated by his check register, with its actual status, as indicated by the bank statements, he relied solely upon the information contained in the register concerning his account's balance. Consequently, from his point of view, when the $6,500.00 check he received in July bounced, his entire record keeping system was disrupted. Despite the fact that Debtor knew this substantial payment was never actually received, he never corrected his check register to reflect the true state of affairs. Thus, his register would always indicate an account balance of at least $6,500.00 more than was actually there. He persisted in accepting the register's accuracy and continued to act upon it notwithstanding the contrary information he continually re-

ceived from his bank, through the monthly bank statements and periodic notices concerning bounced checks. We find that by doing so, the debtor acted unreasonably, with a conscious, even dangerous, disregard to the true state of affairs. *See In re Kurdoghlian, supra,* 30 B.R. at 502; *In re Mullin, supra,* 51 B.R. at 379. This unreasonably held belief as to the account's balance is an insufficient basis upon which to claim no knowledge of false representation.

This little dissertation brings us up to October 3, 1985, shortly before debtor issued the first check in question to the Auto Auction. On this date, debtor's bank received three checks—which together totalled more than the balance in Debtor's account—in the amounts of $280.00, $500.00, and $1,865.00. They were presented for payment against an account having a balance of only $2,310.21. By notice dated October 3, 1985, the bank advised the debtor of this fact. The notice informed him that the three checks had been presented and that the largest of them, $1,865.00, had been dishonored. The other two, totaling $780.00, had been paid. He was also told that a service charge, in the sum of $7.50, had been deducted from his account. Upon receiving this notice, simple mathematics would have told the Debtor that the balance in his account now stood at $1,522.71 ($2,310.21 minus $787.50).

■ Between October 3, and October 14, 1985, the debtor made only one deposit into his account in the sum of $1,200.00. Accordingly, on October 14, 1985, the debtor knew or should have known that his account could contain no more than $2,722.71. This balance assumes that no checks had been written or presented for payment against the account between October 3 and October 14.[3] Despite this fact, however, on October 14, 1985, the debtor issued and delivered a check to the Auto Auction in the sum of $4,730.00—more than $2,000.00 in excess of his highest possible balance. Because of this, the court finds debtor knew or should have known there were not

---

**3.** In reality, checks totaling $685.00 were presented for payment between these two dates

so that, on October 14, 1985, the actual balance on deposit was $2,037.71.

sufficient funds in his account to cover this check and it was issued and delivered to the Auto Auction with the intent and purpose of deceiving it.

Between October 14 and October 28, Debtor made only two deposits into his account. The first, in the sum of $300.00, was made on October 23, 1985. The second, for $930.00, was made on October 24, 1985. The actual balance on deposit on October 28 was only $1,068.03. Had Debtor ever bothered to correct his check register, to eliminate the information he knew was erroneous, simple mathematics would have told him that the account could contain no more than this. Actually, the corrected register would have reflected a lesser amount due to previously issued, but as yet unpresented, checks. Nonetheless, on October 28, debtor issued and delivered a check to the Auto Auction in the sum of $1,230.00, an amount substantially in excess of the existing or any possible balance. The court finds that debtor knew or should have known the check would not be honored and that it was issued and delivered to the auto auction with the intent and purpose of deceiving it.

The court therefore finds that by issuing and delivering checks to the Auto Auction the debtor affirmatively represented that they would be honored by his bank when presented for payment. This representation was materially false because when the checks were written debtor's account did not contain sufficient funds to pay them and debtor had no legitimate expectation or reason to believe that his bank would honor them. The debtor knew or should have known that these checks would not be honored and, therefore, knew his representations were false. Debtor knowingly made these false representations with the intention and purpose of deceiving the Auto Auction. The Auto Auction reasonably relied upon the false representations by delivering possession of the two motor vehicles to the debtor. As a result of the Auto Auction's reliance upon debtor's false representations, it has been damaged in the sum of $5,960.00, the face amount of the checks. Debtor's obligations to Plaintiff in this amount are, therefore, nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

Judgment will be entered accordingly.