**In re Jesse Riis ANDERSON, Debtor.**

**CHECK CONTROL, INC., as assignee from Little Six, Inc., Plaintiff,**

v.

**Jesse Riis ANDERSON, Defendant.**

**Bankruptcy No. 3–93–5573.**
**Adv. No. 3–94–31.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

May 16, 1995.

Kenneth Hertz, Minneapolis, MN, for plaintiff.

Stephen P. Thies, Eden Prairie, MN, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding for determination of dischargeability of debt came on before the Court on November 23, 1994, for trial. The Plaintiff appeared by its attorney, Kenneth Hertz. The Defendant appeared personally and by his attorney, Stephen P. Thies. Upon the evidence adduced at trial, and the memoranda and arguments submitted by counsel, the Court makes the following:

## FINDINGS OF FACT

The Defendant celebrated his eighteenth birthday on July 20, 1993. On that date, he went to the Mystic Lake Casino in Shakopee, Minnesota [1] for the first time in his life. During a session of blackjack, he lost $100.00. The next day, he returned to the casino, again played blackjack, and won about the same amount. Apparently, the experience was stimulating enough that the Defendant began to frequently visit the casino to gamble.

To obtain cash to play at the blackjack tables, the Defendant wrote checks on his personal account at Marquette Bank Shakopee, N.A. ("the Bank"), all made payable to "cash," and presented them to the check-cashing booth at the casino. By the second week of August, 1993, he had cashed 10 to 15 checks, totalling approximately $2,400.00. He used the cash from these transactions to fund his concurrent losses at blackjack, which accumulated to approximately $2,400.00 by August 15. During the time in which he was writing these checks, he did not have the "complete amount" of funds on deposit in his checking account that would have been required to cover them had they been presented immediately to the Bank for payment.[2]

On or about August 15, the Defendant won $3,400.00 at blackjack. He deposited these winnings in his checking account on August 17. Apparently, his outstanding checks to the casino were not presented for payment until after the date of this deposit; he never received notices of dishonor on them, whether from the Bank, the casino, or any agent on behalf of either of them.

The Plaintiff is the assignee and/or agent of Little Six, Inc., for the purpose of collect-

---

1. This establishment is the largest gambling place in a state that has become peppered with them in the past decade. It is owned by Little Six, Inc., a business entity affiliated with the Shakopee Mdewakanton Sioux Community.

2. The Defendant knew this at the time he wrote this first series of checks, and he acknowledged as much at trial.

ing casino patrons' dishonored checks.[3] It also provides "check verification" services to the casino and to other merchants. To use this service, a casino employee takes the patron's check and driver's license at the check-cashing booth, photocopies them, and then enters information off these two items into a data-processing facility, called a "Zahn Unit." This device communicates with the data-storage and -processing facilities at the Plaintiff's office via telephone line, matching it to data that the Plaintiff maintains.[4] Apparently, the Plaintiff's computer then communicates the results of its analysis back to the Zahn Unit at the casino, giving either a "denial code" or an "approval" for the patrons' proffer of the check for cashing. If the Plaintiff gives an approval on the basis of the input data, the casino cashier is to stamp the check with a four-quadrant processing mark, to note the approval and other data in the quadrants, to have the customer endorse the check on the back, and to give cash for the check. If the Plaintiff returns a "denial code," the casino cashier is to decline to give cash for the check, to apologize to the patron, and to offer the patron the Plaintiff's telephone number if the patron wishes to inquire about the reasons for the denial.

The attendants at the casino's check-cashing booth had accepted all of the checks that the Defendant had written through August 15, 1993. There is no evidence as to whether they had accessed the Plaintiff's services for any of these transactions.

On August 21, 1993, the Defendant began a spate of gambling that continued on a daily basis over a period of two weeks. Over its course, he accumulated losses of over $11,-000.00.[5] He again funded this activity by cashing checks at the casino, in amounts that totalled between $400.00 and $1,000.00 each day. The check-cashing attendants at the casino accessed the Plaintiff's data bank for virtually all of these transactions, and received no denial codes for any of them.[6]

The Defendant, however, did not have funds on deposit in the account to cover these checks as he wrote them. Nor did he have sufficient liquid assets in any other form to make good on them. He knew both of these things at the time. In his own words, the Defendant "was planning on winning and getting enough to cover the checks by winning," undoubtedly hoping to repeat his performance of August 15–17.

On scattered occasions throughout this period, the Defendant won substantial sums in blackjack. However, as a whole the experience was disastrous. His losses continued to mount over the Labor Day weekend and beyond.

On August 30, 1993, the Defendant met with a cashier at the Bank, at his own instance. He disclosed that he had written "about $6,000.00 in bad checks" to the casino over the weekend. The cashier advised him that if his account did not contain sufficient funds to cover the checks, the Bank would return them to the casino. He suggested that the Defendant try to make amends with the casino on his own. He then advised the Defendant that the Bank would close his

---

**3.** The exact nature of the Plaintiff's contractual relationship with the casino is not entirely clear from the record. The caption of its complaint terms it an "assignee." However, its president testified that it does not purchase the actual right to payment on account of dishonored checks. According to her, her company's arrangement with Little Six, Inc. provides for the remittance to the casino of all sums collected on NSF checks up to their face amount. As its compensation, the Plaintiff retains any service charges assessable under state statute.

**4.** For some reason, the Plaintiff's counsel did not adduce evidence on the nature of this data though he could have done so by a simple specific question to his client's president. Her answers to other questions suggest that the data

consists in large part (or perhaps exclusively) of whether the patron in question has passed an NSF check before. It is not clear whether the Plaintiff verifies only whether it has had a past request from one of its own clients to collect a bad check passed by the particular patron, or whether it has access to a data base on passers of bad checks that is broader in scope and source than its own experience in the business of collections.

**5.** This sum exceeded the Defendant's gross income from gainful employment for the full calendar year of 1993, which was $10,156.92.

**6.** This fact is evidenced by the substantial completion of stamped quadrant blocks on nearly all of the checks.

account if he continued to pass NSF checks or otherwise misused his privileges.

At this point, the Defendant intended to continue gambling and was still counting on reversing his fortunes to the point that he could cover the outstanding checks. For the next week, he continued to pass checks at the casino. Over the two weeks in question, he wrote 59 checks to the casino, for face amounts that totalled $11,600.00. The Bank dishonored all of these checks when they were presented for payment between August 31 and September 9, 1993. The first 33 were dishonored for insufficient funds on deposit.[7] On September 9, 1993, the Bank closed the Defendant's account due to the string of NSF checks.[8] Almost immediately after the account closure, twenty-six more checks cashed at the casino were presented for payment on September 9 or 10. The Bank "reversed" all of these checks, stamping them as "ACCOUNT CLOSED" and returning them to the casino.

On September 8, the first of the NSF checks had started showing on the Plaintiff's data banks as transmitted through the Zahn Unit. The check-cashing attendants at the casino then refused to accept any more checks from the Defendant. Within a day or two after that, the Defendant received his first dunning notice from the Plaintiff, in its capacity as collector.

7. The terms of the Defendant's account with the Bank did not include the sort of line of credit currently known in the consumer banking industry as "overdraft protection." The Defendant was aware of this when he wrote this series of checks.

8. An operations officer of the Bank formally notified the Defendant of this action by a letter dated September 10, 1993.

9. This notice is an almost verbatim repetition of the one the Bank had sent to the Defendant on September 10. As evidence going to the date of the actual account closure, it conflicts with the treatment given to the checks presented on September 9–10—which had been dishonored as "ACCOUNT CLOSED" items. To further complicate things, testimony by the Defendant suggested that he had prevailed on an employee of the Bank to keep his account open after the first notice, by promising to deposit enough funds to cover all outstanding checks. The statement for the account dated October 6, 1993 shows that the

On September 20, 1993, the Defendant applied for an extension of credit from the Bank, to try to make good on the outstanding checks to the casino. The loan officer who reviewed the loan application turned him down, for the stated reasons of insufficient income, inadequate collateral, and lack of credit history. On or about the same date, the Bank issued a second notice to the Defendant that it was closing his checking account. This notice gave the continued presentation of NSF checks as the reason for the Bank's action.[9]

Finally, on November 24, 1993, the Defendant sought the protection of this Court, by filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

### I. Dischargeability of Debt.

The Plaintiff seeks a judgment that the debt in question here [10] is nondischargeable in bankruptcy. It pleads its request under 11 U.S.C. § 523(a)(2)(A), which creates an exception from discharge for any debt incurred under "false pretenses, a false representation, or actual fraud."

As the Plaintiff's counsel would have it, a complaining creditor need prove only that a debtor uttered a check that was later dishonored upon presentment, to estab-

Defendant deposited a total of $1,150.65 between September 14 and September 22, 1993, with all but $43.67 of that amount coming in on or before September 16. While no checks written to "Cash" at the casino were presented after September 10, another six checks, to unknown payees and in small face amounts, were presented later in September after the Bank closed the account for the final time. These items of evidence tend to corroborate the Defendant's statement that he salvaged his account privileges around the date the first notice of closure was issued. Ultimately, the contradiction in the evidence as to the last date on which the Defendant had account privileges at the Bank is not material—as will be seen from the analysis later in this decision.

10. As observed in n. 3, the identity of the real party in interest as obligee under this debt is uncertain. This, however, is of no moment, since the Defendant did not challenge the named plaintiff's standing to recover a judgment against him.

lish that the underlying debt is excepted from discharge under this provision. The courts, however, have rejected this position across the board—at least when it is stated so baldly and without a qualifying rationale. *E.g., In re Burgstaler,* 58 B.R. 508, 512 (Bankr.D.Minn.1986); *In re Miller,* 112 B.R. 937, 940 n. 1 (Bankr.N.D.Ind.1989); *In re Hammett,* 49 B.R. 533, 535 (Bankr.M.D.Fla. 1985); *In re Barnacle,* 44 B.R. 50, 53 (Bankr. D.Minn.1984); *In re Sutton,* 39 B.R. 390, 397 (Bankr.M.D.Tenn.1984); *In re Paulk,* 25 B.R. 913, 918 (Bankr.M.D.Ga.1982); *In re Anderson,* 10 B.R. 296, 297 (Bankr.W.D.Wis. 1981). This conclusion is mandated in large part because, as contemplated by § 523(a)(2)(A),

> [a]ctual fraud involves moral turpitude and does not include fraud implied in law which may exist without imputation of bad faith or intentional wrong.

*In re Pommerer,* 10 B.R. 935, 939 (Bankr. D.Minn.1981). As a result, fraud imputed by a statutory provision—such as that in Minn. Stat. § 609.535 [11]—is not sufficient to establish nondischargeability. To prevail in a dischargeability proceeding under § 523(a)(2)(A), a plaintiff must demonstrate that the debtor engaged in conduct that is truly blameworthy in an everyday sense, as well as in a technical, legal sense.

■ In this Circuit, a creditor proceeding under § 523(a)(2)(A) must prove up certain elements:

1. The debtor made false representations;

2. The debtor knew the representations to be false at the time the debtor made them;

3. The debtor made the representations with the intention and purpose of deceiving the creditor;

4. The creditor actually relied on the debtor's representations; and

5. The creditor sustained the alleged injury as the proximate result of the making of the representations.

*In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987), as modified by *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987); *In re Dallam,* 850 F.2d 446, 449 (8th Cir.1988); *In re Gibson,* 149 B.R. 562, 568 and n. 3 (Bankr. D.Minn.1993). Other circuits have framed the elements in much the same way. *E.g., In re Bercier,* 934 F.2d 689, 691 (5th Cir.1991); *In re Houtman,* 568 F.2d 651, 655 (9th Cir. 1978) (applying § 35(a)(2) of Bankruptcy Act of 1898).

■ In proceedings under § 523(a)(2)(A) where the underlying event is the passing of an NSF check by a debtor, the first element of this test is somewhat problematic. The whole notion of a "false representation" suggests an affirmative statement of fact, objectively and actively manifested by the debtor. *In re Reder,* 60 B.R. 529, 535–36 (Bankr. D.Minn.1986). In proceedings involving NSF checks, the fact that is the subject of such a representation necessarily is that the check in question is the functional equivalent of cash—*i.e.,* that it can be exchanged for value on deposit in the account of the drawer-debtor, when and as the holder presents it for payment. The reported cases almost never involve an overt representation by the debtor to the plaintiff-payee to the effect that

---

11. This statute is part of the Minnesota Criminal Code. Under it, the issuance of a dishonored check is a misdemeanor if "at the time of issuance, the issuer intends [the check] shall not be paid ..." Minn Stat. § 609.535 subd. 2. In turn, subd. 3 provides, in pertinent part:

> **Proof of intent.** Any of the following is evidence sufficient to sustain a finding that the person at the time the person issued the check intended it should not be paid:
>
> .    .    .    .    .
>
> (2) proof that, at the time of issuance, the issuer did not have sufficient funds or credit with the drawee and that the issuer failed to pay the check within five business days after mailing of notice of nonpayment or dishonor as provided in this subdivision; or

(3) proof that, when presentment was made within a reasonable time, the issuer did not have sufficient funds or credit with the drawee and that the issuer failed to pay the check within five business days after mailing of notice of nonpayment or dishonor as provided in this subdivision.

.    .    .    .    .

The Plaintiff's counsel does not cite any provision of this section in support of his proposition. To the extent that he is arguing it by analogy, however, he is simply wrong. This is a criminal statute and therefore is inapplicable to a bankruptcy case. Further, it creates a presumption of fraud, or at least a permissible inference of it, that does not require direct evidence of actual state of mind.

"the check is good"—*i.e.*, that it was contemporaneously backed by funds on deposit and/or would otherwise be honored on presentment. In the absence of such a statement, the courts have had to strain to identify a positive act or manifestation by the debtor that could be used to satisfy the element of a "representation."

In a minority of cases, the courts opine that the lack of any extrinsic representation by the debtor as to the soundness of a proffered check simply defeats the creditor's case, for want of the first element. These courts opine that the mere act of tendering a check in payment of a pre-existing or current obligation is not a representation of fact, and cannot itself impose liability under any statute that punishes a false representation that has caused financial harm. They look to the United States Supreme Court decision of *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) as their source of authority. *In re Hunt*, 30 B.R. 425, 437–38 (M.D.Tenn.1983); *In re Ritzer*, 105 B.R. 424, 428 (Bankr.S.D.Ohio 1989); *In re Jenkins*, 61 B.R. 30, 40 (Bankr.D.N.D. 1986); *In re Stacey*, 105 B.R. 672, 675 (Bankr.S.D.Ala.1989); *In re Hammett*, 49 B.R. 533, 535 (Bankr.M.D.Fla.1985); *In re Younesi*, 34 B.R. 828, 829 (Bankr.C.D.Cal. 1983).

This Court expressed strong skepticism about this approach in *In re Burgstaler*, noting that *Williams* arose out of a criminal case, charged out under a statute that made no mention of the specific conduct of writing an ultimately-dishonored check, and that the *Williams* Court "ultimately based its ruling on its historical reluctance to expansively construe criminal statutes ..." 58 B.R. at 513 (citing to *Williams*, 458 U.S. at 286 and 290, 102 S.Ct. at 3092 and 3094–95). The configuration of facts and issues in *Burgstaler* was such that another issue was dispositive, and in favor of the defendants, so the Court did not have to reach this issue. This case is not of the same makeup, however, so it must and can be said conclusively: because it applies a very different statute in a wholly different context, *Williams* is not binding precedent in a proceeding under § 523(a)(2)(A).[12]

In a second line of cases, the courts attempt to meet the seeming deficiency in § 523(a)(2)(A) theory by engrafting a legal fiction: the act of tendering a check is "an implicit representation" that the check is good. *E.g.*, *In re Kurdoghlian*, 30 B.R. 500, 502 (Bankr. 9th Cir.1983); *In re Miller*, 112 B.R. at 940 n. 1. At least when it is phrased as such, this rationale is even less defensible than the *Williams*-based one.[13]

The reason is the poor fit between the fiction's characterization and the facts' actuality, in light of basic principles of dischargeability theory. Under one of the familiar chestnuts of that theory, the complaining creditor bears a strict burden of proving all of the elements of a nondischargeable debt, whether those elements are statutory or judicially-recognized. FED.R.BANKR.P. 4005; *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir.1993); *In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988); *In re Van Horne*, 823 F.2d at 1287;[14] *In re Carothers*, 22 B.R. 114, 120 (Bankr.D.Minn.1982). How, then, can

**12.** In addition, the basic reasoning of *Williams* is open to question, if for no reason other than that it is phrased too broadly. In opining that, "technically speaking, a check is not a factual assertion at all," the *Williams* Court used various citations to Article 3 of the Uniform Commercial Code as support for its conclusion that a check constituted no more than a promise to pay. 458 U.S. at 285, 102 S.Ct. at 3092. It did not acknowledge that the law recognizes nonverbal conduct as a "statement" in many contexts and for many purposes—e.g., FED.R.EVID. 901(c)—and that the broader act of tendering a check as proffered consideration in a contemporaneous exchange could defensibly be held to communicate meaning at least for some purposes under law.

**13.** This is so even though the two theories impose nearly opposite burdens on plaintiffs, and generally lead to very different outcomes.

**14.** In *In re Van Horne*, the Eighth Circuit held that the proof to support findings on each element had to be "clear and convincing." Since the Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *Van Horne* is no longer good law as to the standard of proof. It still stands, however, as to its imposition of the initial burden of production.

the Bankruptcy Court justify itself in deeming the element of an *express* statement to have been met when the creditor proves no more than that a small, pre-printed bank form physically passed hands in connection with a commercial transaction? As between the drawer and the drawee, a check is nothing more than a directive to transfer funds from the account of the drawer to the order of the payee, upon the presentment of the instrument. MINN.STAT. §§ 336.3–104(f), 336.3–104(e), 336.3–104(b), and 336.3–104(a). *See also Olsen–Frankman Livestock Marketing Serv., Inc. v. Citizens Nat'l Bank,* 4 B.R. 809, 813 (D.Minn.1980) (applying language of preceding Minnesota enactment of Article 3 of Uniform Commercial Code). Again stripped to its essence, as between the drawer and the payee the *tender* of a check is really no more than the drawer's acknowledgement that his debt to the payee exists, combined with a promise to pay the stated amount if the drawee does not honor the check. MINN.STAT. § 336.3–414(b); *Olsen–Frankman Livestock Marketing Serv., Inc. v. Citizens Nat'l Bank,* 4 B.R. at 813. The tender and passage of a check to the payee suspends the underlying obligation of payment *pro tanto.* MINN.STAT. § 336.3–310(b); *Village of New Brighton v. Jamison,* 278 N.W.2d 321, 325 (Minn.1979); *Olsen v. Preferred Risk Mut. Ins. Co.,* 284 Minn. 498, 498–503, 170 N.W.2d 581, 585 (1969) (both cases applying language of preceding Minnesota enactment of Article 3 of Uniform Commercial Code). However, as a general rule it does not impact in any other way on the underlying contractual relationship between the drawer and the payee.

The basic character of the transaction of payment by check, then, is the simple, silent exchange of a negotiable instrument for consideration of more obvious and tangible value. Deeming that a representation was somehow "implicit" in it amounts to recognizing just the sort of "fraud implied in law" that is to be shunned in a determination of dischargeability.

When the defects in these two lines of decisions are thus brought to light, they raise a conundrum. Many dischargeability actions based on the passing of bad checks carry the strong semblance of debtor wrongdoing that should be subjected to sanction. Given the appellate courts' framing of the elements, however, how is the Bankruptcy Court to find some sort of signal act, so it can go beyond the threshold element to reach the central issue of the debtor's intent?

The solution to this impasse lies in an alternative provision of § 523(a)(2)(A), one that is not applied enough in the reported decisions. While it has been said that "[f]alse pretenses, false representations and actual fraud are virtually indistinguishable," *In re Pommerer,* 10 B.R. at 938, other courts have more closely analyzed the statutory text. These courts take note of the fact that § 523(a)(2)(A) identifies three distinct triggering events, each constituting a different overt manifestation of the same sort of deceptive animus. *E.g., In re Begun,* 136 B.R. 490, 494–95 (Bankr.S.D.Ohio 1992); *In re Dunston,* 117 B.R. 632, 639 (Bankr.D.Colo. 1990); *In re Schnore,* 13 B.R. 249, 251–52 (Bankr.W.D.Wis.1981). In these courts' view, the concept of "false pretenses" contemplates

> a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. "False pretense" may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak.

*In re Dunston,* 117 B.R. at 641. *See also In re Scarlata,* 127 B.R. 1004, 1009 (N.D.D.Ill. 1991), *aff'd,* 979 F.2d 521 (7th Cir.1992); *In re Begun,* 136 B.R. at 494; *In re Schmidt,* 70 B.R. 634, 640 (Bankr.N.D.Ind.1986); *In re Weinstein,* 31 B.R. 804, 810 (Bankr.E.D.N.Y. 1983).

The Eighth Circuit has not expressly held that a "false pretense" is distinct from a "false representation" or "actual fraud," but equally actionable under § 523(a)(2)(A). However, it was driving at very much the same thing in *In re Van Horne,* when it recognized that a debtor's maintenance of silence as to a fact material to his prospective

debt obligation to a creditor may be sufficient to satisfy the first element of its enunciated test under § 523(a)(2)(A). *See* 823 F.2d at 1288. *See also In re Pommerer*, 10 B.R. at 939. The thought underlying both of these formulations is basically the same: where the debtor has possession of material information that may bear on the creditor's willingness to extend a financial accommodation to him; knows that the creditor would consider it; fails to disclose it; creates or allows the creation of the semblance of a very different state of affairs; and reinforces that imposture by the withholding of the material information, the debtor has acted in a way to trigger § 523(a)(2)(A). The recognition of a more passive "false pretense" as a means to satisfy the first element, then, is clearly within the contemplation of *Van Horne* and *Ophaug*.[15]

■ This analytic refinement serves the case at bar quite well. Though the casino's check-cashing personnel never even inquired of the Defendant as to whether his checks were "good," and though the Defendant never affirmatively represented anything of the sort, the Plaintiff's case does not fail. By blithely issuing dozens of his checks to a long succession of such personnel, allowing them to process them, and then readily accepting the cash that he sought, the Defendant actively created the semblance that every single check was backed by value on deposit which the casino could recover by presenting the check for payment. The pretense that accompanied his tender of the instruments was that his bank would honor them, when, as, and whenever Little Six, Inc. presented them as bearer.[16] It was instrumental in inducing the casino to make the even-for-even exchange of cash for the checks. *Cf. In re Miller*, 112 B.R. at 938–40 (recognizing that in sales transactions involving payment by check, "the only reason a debtor [is] given

possession of the property purchased [is] because he . . . apparently [pays] the purchase price" by tendering the check).

This pretense, of course, was false. The Defendant very well knew it was so throughout the time in which he sustained it. Though it seems there were enough funds on deposit in his account to have covered the first two or three checks in the post-August 21 series, he had no more than that. Almost immediately, the Defendant's blackjack losses exhausted his outside means. He knew that he was gambling, that the essence of gambling is that someone has to lose, and that no gambler ever has a guarantee of winning a cent. His ongoing experience was vividly illuminating this little verity. Rather than responding prudently, however, he continued to play, to pass checks, and to play again, on the increasingly-fantastical hope that his luck would turn and that he could beat the outstanding checks to his bank with a deposit of winnings. The pretense, of course, became more and more false with each check, and he knew that all along. Though the Defendant conveyed his artifice of solvency by passive rather than active means, his conduct nonetheless satisfies the first and second elements of § 523(a)(2)(A).

By tendering each check, the Defendant intended to induce the casino's personnel to rely on that pretense—that is, to give him cash in an amount equal to the face value of the check. This intent to induce a material change of position on the part of the creditor, in and of itself, is sufficient to meet the third element, of fraudulent intent. *In re Hunter*, 771 F.2d 1126, 1129 (8th Cir.1985); *In re Swan*, 156 B.R. 618, 623 n. 6 (Bankr.D.Minn. 1993); *In re Gibson*, 149 B.R. at 572.

The Plaintiff also has proved up the fourth element, reliance, though it did so more by invoking the universal understanding of transactions by check in our consumer-based

---

**15.** Of course, the extent to which the communication of an impression will meet the element will vary from case to case, and it may well turn on the setting of the communication. The tender of a million-dollar check at a neighborhood convenience store involves such an obvious disjunction that it could not be deemed to convey any sort of impression, other than utter *chutzpah*. The same act at a large brokerage house might

well satisfy the element, at least with the proper attendant circumstances.

**16.** Recognizing the pretense in so many words only mirrors the actual expectation of the payee/bearer of any check, which in turn "gives effect to the commercial realities . . . which accompany payment by check." *In re Miller*, 112 B.R. at 940 n. 1.

economy than it did by producing direct evidence. When a merchant, bank, or other commercial payee receives a check, it perforce relies in whole or in part on the communicated pretense that the check, as consideration, is very close to the equivalent of cash. The several employees of the casino that waited on the Defendant relied on just that pretense in accepting his checks for cashing.

■■■ Contrary to the Defendant's counsel's argument, the Plaintiff's case on this element is not defeated by the casino's use of the Plaintiff's verification services. The spread of check-kiting and other fraudulent abuses has prompted many merchants to make use of such procedures. A merchant's resort to them, however, does not supplant its reliance on its patrons' tacit representations that their checks are good; its use of the data that check verification services supply only operates as a control on the trust that it reposes in the patrons themselves. This is due to the very limited nature of the material information that check-verification services can obtain and dispense to their customers. Even were check verification services able to ascertain the current balance of subjects' accounts,[17] such disclosure would be accurate only for the very instant it was made; as early as seconds later, the presentment and honoring of another check, or third-party action like garnishment or levy, could empty the account of funds.[18]

As a result, check-verification services can do no more than provide some evidence of the maker's past responsibility in issuing checks—as, apparently, the Plaintiff did and does. Though a payee may rely in part on such a third-party investigation, it does not do so to the exclusion of other factors. Nor could it ever justify such exclusivity, given the limited scope of the results. Thus, any payee on a check relies at least in part on the pretense previously noted: that the tendered check is a practical substitute for cash, reducible to fungible value when and as the payee elects to do so. This can satisfy the reliance element of § 523(a)(2)(A). Even though the Plaintiff's evidence on this element was skeletal at best,[19] it was sufficient given the nature of the transactions in question.

The last element, damage, requires no great amount of discussion. The Defendant does not deny that the Plaintiff advanced him $11,600.00 in cash as a direct consequence of his tender of the checks that were dishonored soon thereafter. It lost this value as a proximate result of the false pretense he created. The final element of § 523(a)(2)(A), then, is satisfied. The Defendant's debt to the Plaintiff is excepted from his discharge in bankruptcy.

## II. Amount of Debt.

Given the two-part nature of the Plaintiff's prayer for relief, it is necessary to apply state law next.

The Plaintiff seeks a money judgment against the Defendant for the total face value of the checks, "plus any service charge and civil penalties assessed under" MINN.STAT. § 332.50, interest, and its attorney fees, costs and disbursements. The first component of this request is supported by the evidence and law, and requires no discussion. Because the Minnesota state appellate courts have not reported any decisions under the statutes that govern the rest, however, a more extended treatment is warranted.

■■■ MINN.STAT. § 332.50 is titled "Civil liability for issuance of worthless check." It creates certain rights of recovery for the holder of a dishonored check, above and beyond any preexisting contractual or statutory right to receive the face value of it. As a general prerequisite to such a recovery, § 332.50 subd. 3 requires the holder to send

17. Financial privacy laws generally prohibit a payee or its agent from getting information like this, at least of any specificity, absent consent of the account holder.

18. Legally, a check does not operate as an immediate and irrevocable assignment of any like amount of value that is on deposit in the maker's account. MINN.STAT. § 336.3–408. *See also In re*

*Ramy Seed Co.,* 57 B.R. 425, 429 (Bankr.D.Minn. 1985) (applying predecessor to MINN.STAT. § 336.3–408, which had identical language).

19. For some reason, the Plaintiff's counsel did not bother to call an employee of Little Six, Inc. to testify from the perspective of the casino's management.

a notice of nonpayment or dishonor to the drawer.[20] If the drawer does not pay the check and any service fee imposed pursuant to § 332.50 subd. 2(d)[21] within 30 days of the mailing of the notice of dishonor, § 332.50 subd. 2(a) imposes additional liabilities on the drawer: a civil penalty "of up to $100 or up to 100 percent of the value of the check, whichever is greater"; interest on the face amount of the check at the statutory rate of interest on judgments; and, in more serious cases of bad-check passing, the holder's "reasonable" attorney fees.[22] Section 332.50 subd. 2(c) permits the drawer to tender an amount in settlement that is lesser than the holder's full right of recovery under subd. 2(a), if he does so before the holder has had its "action [on the check(s) ] ... heard by the court."[23]

The Plaintiff established its right to an enhancement of its recovery under § 332.50 subd. 2(a): it mailed statutory notices of dishonor to the Defendant,[24] he did not make good on the checks within 30 days, and he did not tender an amount in settlement before this adversary proceeding went to trial. As a result, it is entitled to recover interest on the face amount of the checks, as accrued from their various dates of dishonor. It may also recover a reasonable attorney fee for this adversary proceeding.[25]

█ The same statute also requires the imposition of a civil penalty. The operative language—"[w]hoever issues any check that is dishonored ... *is* liable to the holder" (emphasis added)—is phrased in the mandatory; the court does not have discretion to decline to impose a penalty. It is equally clear, however, that the court can vary the amount of the penalty: the phrasing that sets the amount as "up to" a sum certain "or up to" the full face amount of the check, "whichever is greater," plainly operates to set a *cap* on the amount of the penalty, defined as the greater of two amounts that are fixed with reference to different factors.

**20.** In pertinent part, this statute provides:

> **Subd. 3. Notice of dishonor required.** Notice of nonpayment or dishonor that includes a citation to this section and [MINN.STAT. §] 609.535, and a description of the penalties contained in these sections, shall be sent by the payee or holder of the check to the drawer by certified mail, return receipt requested, or by regular mail, supported by an affidavit of service by mailing, to the address printed or written on the check.

**21.** This statute provides:

> A service charge may be imposed immediately on any dishonored check, regardless of mailing a notice of dishonor, if written notice of the service charge was conspicuously displayed on the premises when the check was issued. The service charge may not exceed $20, except that if the payee uses the services of a law enforcement agency to obtain payment of a dishonored check, a service charge of up to $25 may be imposed if the service charge is used to reimburse the law enforcement agency for its expenses. A payee may impose only one service charge under this paragraph for each dishonored check.

**22.** The language of this statute is:

> Whoever issues any check that is dishonored and is not paid within 30 days after mailing a notice of dishonor that includes a citation to this section and [MINN.STAT. § ] 609.535, and a description of the penalties contained in these sections, in compliance with subdivision 3, is liable to the holder for: (1) the amount of the check plus a civil penalty of up to $100 or up to 100 percent of the value of the check, whichever is greater; (2) interest at the rate payable on judgments pursuant to [MINN.STAT. § ] 549.09 on the face amount of the check from the date of dishonor; and (3) reasonable attorney fees if the aggregate amount of dishonored checks issued by the issuer to all payees within a six-month period is over $1,250.

**23.** The full text of this statute is:

> After notice has been sent but before an action under this section is heard by the court, the plaintiff shall settle the claim if the defendant gives the plaintiff the amount of the check plus court costs, any service charge owed under paragraph (d), and reasonable attorney fees if provided for under paragraph (a), clause (3).

**24.** The testimony of the Plaintiff's president and copies of its records from its data banks established that it had sent computer-generated statutory notices of dishonor to the Defendant on all of the checks, in accordance with its standard practices. The testimony was somewhat general, but the Defendant did not challenge it.

**25.** The Plaintiff presented no evidence on the amount of its attorney fees, but it could not have done so in a conclusive fashion until the trial adjourned anyway. If it chooses to go ahead on this part of its claim, it can do so by a motion for supplemental judgment. The Defendant then will have an opportunity to object to the reasonableness of any amount requested.

It does not create an *entitlement* to the greater amount. The Plaintiff is not statutorily entitled to double its recovery under the penalty provision, as its counsel perfunctorily but groundlessly argues.

On balance, it seems most appropriate to impose a penalty of $50.00 per dishonored check. This amount is sufficient to punish the Defendant for the rather dreadful mistake he deliberately made, without imposing an unfair burden or granting the Plaintiff an undue windfall. At the level of 59 checks, the Plaintiff is entitled to the benefit of a civil penalty of $2,950.00.

These statutory enhancements of the Plaintiff's award are ancillary to the Defendant's acknowledged contractual obligation. Because the main debt is nondischargeable, they are as well. *In re Hunter*, 771 F.2d at 1131. *See also In re Miera*, 926 F.2d 741, 745 (8th Cir.1991).

The Plaintiff also requested an award of accumulated service charges at the rate of $20.00 per dishonored check pursuant to § 331.50 subd. 2(d). It did not prove up this part of its claim at trial; there is no evidence, testimonial or documentary, that the casino "conspicuously displayed" a written notice of this possible charge, at or around the check-cashing booth. The statute makes this notice a prerequisite for the right to impose and recover this charge. The Plaintiff has no claim against the Defendant under this statute.

### ORDER FOR JUDGMENT

Upon the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That the Plaintiff shall recover from the Defendant the sum of $11,600.00, together with interest on that sum to the date of this order and judgment as provided by MINN.STAT. § 332.50 subd. 2(a)(2); the sum of $2,950.00, as a penalty pursuant to MINN. STAT. § 332.50 subd. 2(a)(1); such reasonable attorney fees for this adversary proceeding as it may prove up via motion for supplemental judgment; and its filing fee for this adversary proceeding in the sum of $120.00.

2. That the debt evidenced by Term 1 hereof was excepted from the discharge in bankruptcy granted to the Defendant by this Court's order of March 1, 1994, in BKY 3–93–5573, by operation of 11 U.S.C. § 523(a)(2)(A).

LET JUDGMENT BE ENTERED ACCORDINGLY.